

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-29-2005

# In Re: Armstrong

Precedential or Non-Precedential: Precedential

Docket No. 05-1881

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"In Re: Armstrong " (2005). *2005 Decisions*. Paper 3.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/3

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-1881

———

IN RE: ARMSTRONG WORLD INDUSTRIES, INC.,
Appellant

———

On Appeal from the United States District Court
for the District of Delaware
(No. 00-04471)
District Judge: Honorable Eduardo C. Robreno

———

Argued October 24, 2005

Before:  SLOVITER and FISHER, Circuit Judges, and
THOMPSON*, District Judge

(Filed: December 29, 2005)

———

Gregory S. Coleman   (Argued)
Weil, Gotshal & Manges LLP
Austin, TX 78759

Stephen Karotkin
Debra A. Dandeneau
Weil, Gotshal & Manges LLP
New York, NY 10153

Mark D. Collins
Rebecca L. Booth
Richards, Layton & Finger, P.A.
Wilmington, DE 19899

Attorneys for Appellant Armstrong World Industries, Inc.

Mark E. Felger
Jeffrey R. Waxman
Cozen & O'Connor
Wilmington, DE 19801

Stephen J. Shimshak  (Argued)
Andrew N. Rosenberg
Curtis J. Weidler
Paul, Weiss, Rifkind, Wharton & Garrison LLP
New York, NY 10019

Attorneys for Appellee Official Committee of Unsecured
Creditors of Armstrong World Industries, Inc.

Marla R. Eskin
Campbell & Levine, LLC
Wilmington, DE 19801

Elihu Inselbuch
Caplin & Drysdale, Chartered
New York, NY 10022

Peter Van N. Lockwood
Nathan D. Finch
Caplin & Drysdale, Chartered
Washington, D.C. 20005

Attorneys for Appellee Official Committee of Asbestos
Claimants of Armstrong World Industries, Inc.

James L. Patton, Jr.
Sharon M. Zieg
Edwin J. Harron
Young, Conaway, Stargatt & Taylor, LLP
Wilmington, DE 19801

Michael J. Crames
Andrew A. Kress

2

Kaye Scholer, LLP
New York, NY 10022

> Attorneys for Appellee Dean M. Trafelet, Legal
> Representative for Future Asbestos Personal Injury
> Claimants of Armstrong World Industries, Inc.

## OPINION OF THE COURT

THOMPSON[*], <u>District Judge</u>.

This matter is before the Court on Armstrong Worldwide Industries, Inc.'s ("AWI") appeal of the District Court's decision to deny confirmation of AWI's bankruptcy reorganization plan. In its decision, the District Court concluded that the plan could not be confirmed because the distribution of warrants to AWI's equity interest holders over the objection of the class of unsecured creditors violated the absolute priority rule, as codified in 11 U.S.C. § 1129(b)(2)(B). AWI filed a timely appeal, contending that (1) the issuance of warrants does not violate the absolute priority rule, and (2) an equitable exception to the absolute priority rule applies. For the following reasons, we affirm the judgment of the District Court.

I.

## FACTS AND PROCEDURAL HISTORY

AWI designs, manufactures, and sells flooring products, kitchen and bathroom cabinets, and ceiling systems. Due to asbestos litigation liabilities, AWI and two of its subsidiaries filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware on December 6, 2000. The United States Trustee for the District of Delaware appointed two committees to represent AWI's unsecured creditors: (1) the Official Committee of Asbestos Personal Injury Claimants

---

[*]Honorable Anne E. Thompson, United States District Judge for the District of New Jersey, sitting by designation.

("APIC"), and (2) the Official Committee of Unsecured Creditors ("UCC"). The Bankruptcy Court appointed Dean M. Trafelet as the Future Claimants' Representative ("FCR").

After holding negotiations with APIC, UCC, and FCR, AWI filed its Fourth Amended Plan of Reorganization (the "Plan") and Amended Disclosure Statement with the Bankruptcy Court in May 2003. Under the Plan, AWI's creditors were divided into eleven classes, and AWI's equity interest holders were placed into a twelfth class. Relevant to this appeal are Class 6, a class of unsecured creditors; Class 7, a class of present and future asbestos-related personal injury claimants; and Class 12, the class of equity interest holders who own AWI's common stock. (App. at 1146-47, 1151.) The only member of Class 12 is Armstrong Worldwide, Inc. ("AWWD"), the parent company of AWI, which is in turn wholly owned by Armstrong Holdings, Inc. ("Holdings"). Classes 6 and 7 hold equal priority, and have interests senior to those of Class 12. (App. at 0019.) All three are impaired classes because their claims or interests would be altered by the Plan. 11 U.S.C. § 1124.

The Plan provided that AWI would place approximately $1.8 billion of its assets into a trust for Class 7 pursuant to 11 U.S.C. § 524(g). (App. at 1147-49.) Class 7's members would be entitled to an initial payment percentage from the trust of 20% of their allowed claims. (App. at 1177.) Meanwhile, Class 6 would recover about 59.5% of its $1.651 billion in claims. (App. at 1146-47.) The Plan would also issue new warrants to purchase AWI's new common stock, estimated to be worth $35 to $40 million, to AWWD or Holdings (Class 12). If Class 6 rejected the Plan, then the Plan provided that Class 7 would receive the warrants. (App. at 1149.) However, the Plan also provided that Class 7 would automatically waive receipt of the warrants, which would then be issued to AWWD or Holdings (Class 12).

The Bankruptcy Court set September 22, 2003 as the deadline for voting on the Plan and for the parties to object to the Plan's confirmation. Because the Plan would distribute property to AWI's equity interest holders without fully paying off the

4

unsecured creditors' claims, all impaired unsecured creditor classes were required to approve the Plan under 11 U.S.C. § 1129(a)(8). If any impaired class objected to the Plan, then the Plan could only be "crammed down" if it was "fair and equitable" to the objecting class. See 11 U.S.C. § 1129(b)(1).

UCC represented all of the classes of unsecured creditors, including Class 6, during the negotiations that led to the Plan. Although UCC initially approved of the Plan in May 2003, it later filed a conditional objection to the Plan's confirmation on September 22, 2003 based on (1) the greater potential distribution to creditors that would result if federal asbestos legislation was passed (namely, the FAIR Act), and (2) the possible applicability of the absolute priority rule, as codified in 11 U.S.C. § 1129(b), if the Plan was not accepted by all classes.

As indicated in its conditional objection, UCC's reservations about the Plan were prompted in part by the proposal of the FAIR Act, which was reported out of the Senate Judiciary Committee in July 2003.[1] If passed, the FAIR Act would remove asbestos-related personal injury claims from the courts and absolve asbestos defendants of liability in return for mandatory contributions to a federally supervised trust. (App. at 0017-18.) AWI's contribution to the FAIR Act trust was estimated to range from $520 to $805 million, far less than the $1.8 billion it would put in trust for the Class 7 asbestos claimants under the Plan. Thus, if the FAIR Act passed, approximately $1 billion could be freed up for distribution among AWI's other creditors, including the class of unsecured creditors.

In response to UCC's concerns about the FAIR Act, the Bankruptcy Court extended the final deadline for voting to

---

[1] See generally Patrick M. Hanlon, Asbestos Legislation: The FAIR Act Two Years On, 1 Pratt's J. Bankr. L. 207 (2005). As it happened, the FAIR Act did not pass, but similar bills have been reintroduced in subsequent sessions of Congress. (Appellant's Br. 15; App. at 1243.)

5

October 31, 2003. (App. at 0018.) To accept the Plan, class members holding at least fifty percent of the number of claims and two-thirds of the amount of the claims would need to vote for the Plan. See 11 U.S.C. § 1126(c). Although 88.03% of Class 6 claim holders voted for the Plan, only 23.21% of the amount of the claims voted to accept the Plan. (App. at 1456.) As a result, Class 6 rejected the Plan. Classes 7 and 12 accepted the Plan, but Class 12's acceptance was rescinded under the Plan due to Class 6's rejection. (App. at 0020.)

Following a hearing on November 17 and 18, 2003, the Bankruptcy Court recommended confirmation of the Plan to the District Court in its December 19, 2003 Proposed Findings and Conclusions. (App. at 1430.) The Bankruptcy Court found that the absolute priority rule, as codified in section 1129(b)(2) of the Bankruptcy Code, was satisfied because the warrants were distributed to the holder of equity interests because of the waiver by Class 7, citing In re Genesis Health Ventures, Inc., 266 B.R. 591 (D. Del. 2001), and In re SPM Mfg. Corp., 984 F.2d 1305 (1st Cir. 1993). In addition, the Bankruptcy Court found that UCC had waived its right to object to the Plan when it "entered into a consensual plan encompassing" the Plan provisions. (App. at 1502-03.) Because the Plan included a channeling injunction under section 524(g) of the Bankruptcy Code, the District Court was required to affirm the Bankruptcy Court's Proposed Findings and Conclusions before the Plan could go into effect. (App. at 1468.)

UCC filed objections to the Bankruptcy Court's Proposed Findings and Conclusions with the United States District Court for the District of Delaware. The District Court held a hearing on the objections on December 15, 2004 and issued a memorandum and order on February 23, 2005 denying confirmation of the Plan. The District Court found that (1) the issuance of warrants to the equity interest holders violated the absolute priority rule, and (2) no equitable exception to the absolute priority rule applied. In re Armstrong World Indus., Inc., 320 B.R. 523 (D. Del. 2005).

AWI now appeals the District Court's decision, and is

joined by Appellees APIC and FCR, who jointly submitted a brief adopting and supporting AWI's arguments.

II.

DISCUSSION

A.     Jurisdiction

This Court has jurisdiction to hear appeals of "all final decisions of the district courts." 28 U.S.C. § 1291 (emphasis added); Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992). In bankruptcy cases, finality is construed more broadly than for other types of civil cases. In re Marvel Entm't Group, Inc., 140 F.3d 463, 470 (3d Cir. 1998). Because bankruptcy proceedings are often protracted, and time and resources can be wasted if an appeal is delayed until after a final disposition, our policy has been to quickly resolve issues central to the progress of a bankruptcy. See In re Owens Corning, 419 F.3d 195, 203 (3d Cir. 2005). We consider four factors to determine whether a district court's decision in a bankruptcy case is final: (1) the impact on the assets of the bankruptcy estate; (2) the need for further fact-finding on remand; (3) the preclusive effect of a decision on the merits; and (4) the interests of judicial economy. See id. (citing Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 250 (3d Cir. 2000)).

Although Appellee UCC contends that we cannot hear this appeal because it involves an interlocutory order rather than a final order, we find jurisdiction after considering the above four factors. First, the District Court's denial of confirmation will likely affect the distribution of assets between the different creditor classes. See Buncher Co., 229 F.3d at 250. Second, the issue presented here requires no additional fact-finding. Third, this appeal would require us to address a discrete question of law that would have a preclusive effect on certain provisions of the Plan. Lastly, practical considerations in the interests of judicial economy require that we hear this appeal now. Because we find jurisdiction under 28 U.S.C. § 1291, we will not address whether

7

we also have jurisdiction under 28 U.S.C. § 158(d).

## B.     Standard of Review

We review the District Court's decision using a de novo standard for conclusions of law, and a clearly erroneous standard for findings of fact.  In re PWS Holding Corp., 228 F.3d 224, 235 (3d Cir. 2000).  Whether a reorganization plan violates the absolute priority rule is a question of law.  See In re Johnston, 21 F.3d 323, 328-29 (9th Cir. 1994).

## C.     Confirmation of a Reorganization Plan

Confirmation of a proposed Chapter 11 reorganization plan is governed by 11 U.S.C. § 1129.  A court will confirm a plan if it meets all of the requirements set out in section 1129(a). Only one of these requirements concerns us in this appeal, and that is the requirement that the plan be consensual, with unanimous acceptance by all of the impaired classes.[2]  11 U.S.C. § 1129(a)(8).  If the plan is not consensual, a court may still confirm as long as the plan meets the other requirements of section 1129(a), and "does not discriminate unfairly, and is fair and equitable" as to any dissenting impaired class.  11 U.S.C. § 1129(b)(1); see Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 441 (1999) [hereinafter LaSalle].  The latter type of confirmation is also called a "cram down," as the court can cram a plan down over the objection of an impaired class.  See generally Kenneth N. Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr. L.J. 133 (1979).

### 1.     The Absolute Priority Rule

The issues in this case require us to examine the "fair and equitable" requirement for a cram down, which invokes the absolute priority rule.  The absolute priority rule is a judicial

---

[2]  A class is impaired if its legal, equitable, or contractual rights are altered under the reorganization plan.  11 U.S.C. § 1124.

invention that predated the Bankruptcy Code. It arose from the concern that because a debtor proposed its own reorganization plan, the plan could be "too good a deal" for that debtor's owners. LaSalle, 526 U.S. at 444. In its initial form, the absolute priority rule required that "creditors . . . be paid before the stockholders could retain [equity interests] for any purpose whatever." Id. (quoting N. Pac. Ry. Co. v. Boyd, 228 U.S. 482, 508 (1913)) (emphasis added).

The absolute priority rule was later codified as part of the "fair and equitable" requirement of 11 U.S.C. § 1129(b). Under the statute, a plan is fair and equitable with respect to an impaired, dissenting class of unsecured claims if (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan "on account of" such claims or interests. 11 U.S.C. § 1129(b)(2)(B)(i)-(ii); LaSalle, 526 U.S. at 441-42.

At the heart of this appeal is the Plan provision that distributes warrants to AWI's equity interest holders (Class 12) through Class 7 in the event that Class 6 rejects the Plan. Appellant AWI argues that this provision does not violate the absolute priority rule because (1) legislative history and historical context indicate that the rule does not prohibit the transfer of warrants to the equity interest holders under the current circumstances; (2) case law establishes that Class 7 can transfer part of its distribution under the Plan to another claimant; and (3) the Plan did not give the warrants to Class 12 "on account of" its equity interests. We address each of these contentions in turn.

a.      Interpreting the Absolute Priority Rule

First, AWI suggests that this Court should apply a flexible interpretation of the absolute priority rule based on its legislative history and historical context. Because the absolute priority rule is now codified as part of the Bankruptcy Code, we will interpret it using standard principles of statutory construction. We begin by looking at the plain language of the statute. See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989). If the

9

meaning is plain, we will make no further inquiry unless the literal application of the statute will end in a result that conflicts with Congress's intentions. Id. at 242-43. In such a case, the intentions of Congress will control. Id.

AWI contends that application of the absolute priority rule would be contrary to Congress's intentions because the rule was designed to prevent the "'squeezing out' [of] intermediate unsecured creditors." See In re Wabash Valley Power Ass'n, 72 F.3d 1305, 1314 (7th Cir. 1995) (citing N. Pac. Ry. Co., 228 U.S. 482) (emphasis added). AWI supports its claim with floor statements by Representative Don Edwards and Senator Dennis DeConcini, key legislators of the Bankruptcy Code. See Begier v. I.R.S., 496 U.S. 53, 64 n.5 (1990) (considering these remarks as "persuasive evidence of congressional intent"). These statements indicate that "a senior class will not be able to give up value to a junior class over the dissent of an intervening class unless the intervening class receives the full amount, as opposed to value, of its claims or interests." 124 Cong. Rec. 32,408 & 34,007 (1978) (remarks of Rep. Edwards on Sept. 28, 1978 and remarks of Sen. DeConcini on Oct. 5, 1978, respectively) (emphasis added). AWI argues that this language demonstrates that the absolute priority rule was not meant to apply to the situation before us because Class 6 is not an intervening (or intermediate) class, and is not being squeezed out by Class 7's transfer of warrants to Class 12 under the Plan.

The absolute priority rule, as codified, ensures that "the holder of any claim or interest that is junior to the claims of [an impaired dissenting] class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). The plain language of the statute makes it clear that a plan cannot give property to junior claimants over the objection of a more senior class that is impaired, but does not indicate that the objecting class must be an intervening class.

We find that the plain meaning of the statute does not conflict with Congress's intent. The legislative history shows that section 1129(b) was at least designed to address "give-up"

situations where a senior class gave property to a class junior to the dissenting class.  Other statements in the legislative history of section 1129(b), however, appear to apply the statute more broadly.  For example, the House Report for H.R. 8200, the bill that was eventually enacted, states that section 1129(b) "codifies the absolute priority rule from the dissenting class on down."  H.R. Rep. No. 95-595, at 413 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6369.  Despite amendments to the original version of H.R. 8200, the House Report has been considered an authoritative source of legislative history for section 1129(b).  See 124 Cong. Rec. 32,408 & 34,007 (1978) (remarks of Rep. Edwards on Sept. 28, 1978 and remarks of Sen. DeConcini on Oct. 5, 1978, respectively) ("[T]he House report remains an accurate description of confirmation of section 1129(b).").  In addition, the floor statements of Representative Edwards and Senator DeConcini do not rule out the possibility that an impaired class may object to a co-equal class's distribution of property to a junior class.  See id. ("As long as senior creditors have not been paid more than in full, and classes of equal claims are being treated so that the dissenting class of impaired unsecured claims is not being discriminated against unfairly, the plan may be confirmed if the impaired class of unsecured claims receives less than 100 cents on the dollar (or nothing at all) as long as no class junior to the dissenting class receives anything at all.").  As a result, we will apply the plain meaning of the statute.  Under this reading, the statute would be violated because the Plan would give property to Class 12, which has claims junior to those of Class 6.  This finding does not end our consideration of this appeal, as AWI makes further arguments regarding exceptions to the absolute priority rule.

   b.  Transfers of Bankruptcy Distributions
      Between Creditors and Equity Interest Holders

   Second, AWI contends that Class 7 may distribute the property it will receive under the Plan to Class 12 without violating the absolute priority rule.  AWI derives this result from application of the so-called "MCorp-Genesis" rule, which is based on a line of cases where creditors were allowed to distribute their proceeds from the bankruptcy estate to other

11

claimants without offending section 1129(b).  See SPM, 984 F.2d 1305 (permitting senior secured creditors to share bankruptcy proceeds with junior unsecured creditors while skipping over priority tax creditors in a Chapter 7 liquidation); Genesis Health, 266 B.R. at 602, 617-18 (allowing senior secured lenders to (1) give up a portion of their proceeds under the reorganization plan to holders of unsecured and subordinated claims, without including holders of punitive damages claims in the arrangement, and (2) allocate part of their value under the plan to the debtor's officers and directors as an employment incentive package); In re MCorp Fin., Inc., 160 B.R. 941, 948 (S.D. Tex. 1993) (permitting senior unsecured bondholders to allocate part of their claim to fund a settlement with the FDIC over the objection of the junior subordinated bondholders).

The District Court rejected this argument, and found that the MCorp-Genesis line of cases was distinguishable.  It began its analysis with SPM, a First Circuit opinion cited by both the MCorp and Genesis Health courts to support the legality of the distribution schemes presented to them.  SPM, 984 F.2d 1305. The District Court differentiated SPM from the current case in three ways: (1) SPM involved a distribution under Chapter 7, which did not trigger 11 U.S.C. § 1129(b)(2)(B)(ii); (2) the senior creditor had a perfected security interest, meaning that the property was not subject to distribution under the Bankruptcy Code's priority scheme; and (3) the distribution was a "carve out," a situation where a party whose claim is secured by assets in the bankruptcy estate allows a portion of its lien proceeds to be paid to others.  Armstrong, 320 B.R. at 539; see generally Richard B. Levin, Almost All You Ever Wanted to Know About Carve Out, 76 Am. Bankr. L.J. 445 (2002).  Similarly, Genesis Health involved property subject to the senior creditors' liens that was "carved out" for the junior claimants.  Armstrong, 320 B.R. at 539.  In addition, the District Court found MCorp distinguishable on its facts because the senior unsecured creditor transferred funds to the FDIC to settle pre-petition litigation.  Id.

We adopt the District Court's reading of these cases, and agree that they do not stand for the unconditional proposition that creditors are generally free to do whatever they wish with

12

the bankruptcy proceeds they receive. Creditors must also be guided by the statutory prohibitions of the absolute priority rule, as codified in 11 U.S.C. § 1129(b)(2)(B). Under the plan at issue here, an unsecured creditor class would receive and automatically transfer warrants to the holder of equity interests in the event that its co-equal class rejects the reorganization plan. We conclude that the absolute priority rule applies and is violated by this distribution scheme.

In addition, the structure of the Plan makes plain that the transfer between Class 7 and Class 12 was devised to ensure that Class 12 received the warrants, with or without Class 6's consent. The distribution of the warrants was only made to Class 7 if Class 6 rejected the Plan. In turn, Class 7 automatically waived the warrants in favor of Class 12, without any means for dissenting members of Class 7 to protest. Allowing this particular type of transfer would encourage parties to impermissibly sidestep the carefully crafted strictures of the Bankruptcy Code, and would undermine Congress's intention to give unsecured creditors bargaining power in this context. See H.R. Rep. No. 95-595, at 416, reprinted in 1978 U.S.C.C.A.N. 5963, 6372 ("[Section 1129(b)(2)(B)(ii)] gives intermediate creditors a great deal of leverage in negotiating with senior or secured creditors who wish to have a plan that gives value to equity.").

c.      On Account of

Third, AWI argues that the warrants would not be distributed to Class 12 on account of their equity interests, but rather would be given as consideration for settlement of their intercompany claims. UCC disputes the existence of any such settlement, alleging that such an arrangement should have been brought to the attention of the Bankruptcy Court. In response, AWI indicates that the settlement was detailed in the Plan's Disclosure Statement, which the Bankruptcy Court approved on June 2, 2003. (Appellee's Br. 4.) The relevant portion of the Disclosure Statement reads as follows:

 In the ordinary course of business, such intercompany claims

13

have been recorded on the books and records of Holdings, AWWD and AWI, and, assuming that all such intercompany claims are valid, the <u>net intercompany claim so recorded is in favor of Holdings in the approximate amount of $12 million</u>. In consideration of, among other things, AWI's agreement under the Plan to fund the reasonable fees and expenses associated with the Holdings Plan of Liquidation, the treatment of Holdings, AWWD, and their respective officers and directors as PI Protected Parties under the Asbestos PI Permanent Channeling Injunction, the simultaneous release by AWI of any claims (known and unknown) AWI has against Holdings and AWWD, and the <u>issuance of the New Warrants to AWWD</u>, and to avoid potentially protracted and complicated proceedings to determine the exact amounts, nature and status under the Plan of all such claims and to facilitate the expeditious consummation of the Plan and the completion of Holdings' winding up, Holdings and AWWD will, effective upon and subject to the occurrence of the Effective Date, release all such intercompany claims (known and unknown) against AWI or any of AWI's subsidiaries[.]

(App. at 1138) (emphasis added).

As stated earlier, section 1129(b)(2)(B)(ii) provides that holders of junior claims or interests "will not receive or retain [any property] under the plan <u>on account of</u> such junior claim or interest." 11 U.S.C. § 1129(b)(2)(B)(ii) (emphasis added). In <u>LaSalle</u>, the Supreme Court interpreted "on account of" to mean "because of," or a "causal relationship between holding the prior claim or interest and receiving and retaining property." 526 U.S. at 450-51. Although the Supreme Court did not decide what degree of causation would be necessary, its discussion on that topic revealed that the absolute priority rule, as codified, was not in fact absolute. First, it indicated that the "on account of" language would be redundant if section 1129(b) was read as a categorical prohibition against transfers to prior equity. <u>Id.</u> at 452-53. Second, it noted that a "less absolute prohibition" stemming from the "on account of language" would "reconcile the two recognized policies underlying Chapter 11, of preserving going concerns and maximizing property available to satisfy

14

creditors." Id. at 453-54.

In keeping with these observations, we noted in PWS that the "on account of" language "confirms that there are some cases in which property can transfer to junior interests not 'on account of' those interests but for other reasons." 228 F.3d at 238 (discussing LaSalle, 526 U.S. at 451-52). In PWS, the debtors released their legal claims against various parties to facilitate their reorganization, including an avoidance claim that would have allowed them to avoid certain aspects of a previous recapitalization. Id. at 232-35. The appellants in PWS argued that releasing the avoidance claim resulted in a prohibited transfer of value to equity interest holders who had participated in the recapitalization. We held that "without direct evidence of causation, releasing potential claims against junior equity does not violate the absolute priority rule in the particular circumstance [where] the claims are of only marginal viability and could be costly for the reorganized entity to pursue." Id. at 242.

AWI would analogize AWWD and Holdings's release of intercompany claims in exchange for warrants to the release of claims in PWS.[3] We disagree. According to the Disclosure Statement, the warrants have an estimated value of $35 to $40 million. (App. at 1157.) In contrast, the intercompany claims were valued at approximately $12 million. This settlement would amount to a substantial benefit for Class 12, especially as the warrants were only part of the consideration for which the intercompany claims were released. Among other things, the intercompany claims were also ostensibly released in exchange for the simultaneous release of any claims by AWI against AWWD or Holdings and facilitation of the reorganization process. (App. at 1138.) AWI gives no adequate explanation for this difference in value, leading us to conclude that AWWD or Holdings (Class 12) would receive the warrants on account of

---

[3] Because AWI does not assert any argument regarding a new value exception to the absolute priority rule, we do not address that issue.

15

their status as equity interest holders.  See LaSalle, 526 U.S. at 456.

D.    Equity

1.    Applicability of Penn Central

Appellant AWI further contends that this Court should apply equitable considerations to allow an exception to the absolute priority rule.  It finds such an exception in the case of In re Penn Central Transportation Co., 596 F.2d 1127, 1142 (3d Cir. 1979), and points to language in Norwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988), that indicates that exceptions to the absolute priority rule may indeed exist.  See id. at 206 (stating that the enactment of section 1129(b) "bar[s] any expansion of any exception to the absolute priority rule beyond that recognized" in pre-1978 Bankruptcy Code cases).

Penn Central involved a "monumental [reorganization] plan designed to resolve what [at the time was] the most complex set of interrelated and conflicting claims ever addressed under . . . the Bankruptcy Act."  596 F.2d at 1129.  Penn Central Transportation Company, which was formed in 1968 by the merger of the Pennsylvania Railroad Company and the New York Central Railroad Company, filed a petition for reorganization under the Bankruptcy Code in 1970.  Id. at 1133. Thereafter, to prevent a rail transportation crisis and to address the particular difficulties of that reorganization, Congress passed the Regional Rail Reorganization Act of 1973, which directed that major portions of Penn Central's rail assets be conveyed to Conrail, a new company formed under the Act to continue operation of some of the routes served by Penn Central.  Id. at 1134.  In light of these exceptional circumstances, we found that "[o]ur construction and application of precedents such as the absolute priority rule must necessarily take account of the unique facts of this Plan and proceed in an environment pervaded more by relativity than by absolutes."  Id. at 1142.

AWI argues that the facts of the case before us are similarly unique, and also warrant a more equitable and flexible

16

application of the absolute priority rule. (Appellant's Br. 36.) Among the facts that AWI finds unique are: (1) the involvement of UCC in the negotiation and drafting of the Plan; (2) UCC's endorsement of the Plan, as indicated by its signature on the cover letter accompanying the disclosure statement; (3) the lack of a negative effect on Class 6's distribution from the granting of warrants to Class 7; (4) the relatively small value of the warrants compared to the entire bankruptcy estate; (5) the acceptance of the Plan by the majority in number of UCC's constituents; and (6) the delay caused by UCC's objection, which was primarily lodged in anticipation of the passage of the FAIR Act. We do not find these facts to be as compelling as those that led us to apply a more flexible absolute priority rule in the past. AWI's bankruptcy due to asbestos liabilities simply does not involve the kind of exigent circumstances present in Penn Central, where Congress intervened in the reorganization process to avoid a rail transportation crisis of national import.

In addition, our application of equitable considerations in Penn Central did not mean that the absolute priority rule was abandoned. Rather, we held firm to the idea that the rule still "required . . . that provision be made for satisfaction of senior claims prior to satisfaction of junior claims." Id. at 1153.

### 2. Judicial Estoppel

AWI also argues that UCC waived its right to object to the Plan because of its conduct during the reorganization process, specifically referring to UCC's role in shaping the Plan, its initial endorsement of the Plan, and then its subsequent objections to the Plan based on the possible passage of the FAIR Act. The Bankruptcy Court agreed with this argument and found that UCC waived its right to object to the Plan because its behavior was "too sharp even for a bankruptcy case." (App. at 1503-04.) The District Court took a different view, noting that

> [e]ven if the Unsecured Creditors changed their minds based on political calculus that the FAIR Act would be passed, this was their prerogative. In the absence of bad faith, which was not alleged here, and particularly in light of the changed

17

circumstances, until a party consents and the consent is final, that party may walk away from the table for a good or bad reason or no reason at all.

Armstrong, 320 B.R. at 534 n.24 (citing In re Huckabee Auto Co., 33 B.R. 141, 149 (Bankr. M.D. Ga. 1981)).

We agree with the District Court, but recast the issue of waiver as an issue of judicial estoppel. Judicial estoppel can be applied when a party asserts a certain position in a legal proceeding and prevails, only to assert a contrary position later on because of changed interests. See New Hampshire v. Maine, 532 U.S. 742, 749-51 (2001). Its purpose is to protect the judicial process by preventing parties from "deliberately changing positions according to the exigencies of the moment." Id. at 750 (quoting United States v. McCaskey, 9 F.3d 368, 378 (5th Cir. 1993)). In deciding whether to apply judicial estoppel, a court considers various factors, including whether the party's position is clearly inconsistent with its earlier position and whether the party changing position would gain an unfair advantage over the opposing party. Id. at 750-51.

UCC clearly changed its position when it lodged a conditional objection to the Plan after it had endorsed the disclosure statement and recommended acceptance of the Plan to its constituents. The confirmation process, however, entitled UCC to lodge an objection against the Plan before the objection deadline. See 11 U.S.C. § 1129(a)(8). We recognize that an objection based on speculation that legislation will be passed can be cause for concern. See EEOC v. Bethlehem Steel Corp., 727 F. Supp. 952, 955 & n.1 (E.D. Pa. 1990) (commenting on the problems that stem from delaying judgment because of pending legislation). UCC's objection, however, was not based solely on the impact of the pending FAIR Act, but was also based on a violation of section 1129(b).

Furthermore, UCC's change in position could not be entirely prejudicial to AWI because the Plan and its disclosure statement were conditioned on the approval of all impaired classes. In fact, Class 6, one of UCC's constituents, did not

18

accept the Plan. While the voting outcome of Class 6 raises the troubling possibility that a small number of hold-outs owning a large percentage of claims were causing costly delay in the reorganization process, this is contemplated by the Bankruptcy Code, which requires at least a majority vote for the number of claims and a supermajority vote for the amount of claims for a class to accept a plan. See 11 U.S.C. § 1126(c). In consideration of these factors, we will not apply judicial estoppel to silence UCC's objection merely because it was an active participant in the reorganization process.

III.

CONCLUSION

We recognize that the longer that the reorganization process takes, the less likely that the purposes of Chapter 11 (preserving the business as a going concern and maximizing the amount that can be paid to creditors) will be fulfilled. Nevertheless, we conclude that the absolute priority rule applies in this case. We will accordingly affirm the District Court's decision to deny confirmation of AWI's Plan.

---