PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

——————————

No. 14-2709

——————————

In re: ICL HOLDING COMPANY, INC., et al.
Debtors

United States of America,
Appellant

——————————

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 1-13-cv-00924)
District Judge: Honorable Sue L. Robinson

——————————

Argued January 14, 2015

Before: AMBRO, FUENTES, and ROTH, <u>Circuit Judges</u>

(Opinion filed: September 14, 2015)

Tamara W. Ashford
   Acting Assistant Attorney General
David A. Hubbert
   Deputy Assistant Attorney General

Thomas J. Clark, Esquire  (Argued)
Bethany B. Hauser, Esquire
Christopher Williamson, Esquire
United States Department of Justice
Tax Division
950 Pennsylvania Avenue, N.W.
P.O. Box 502
Washington, DC   20044

Charles M. Oberly, III
 United States Attorney
Ellen W. Slights, Esquire
Office of the United States Attorney
1007 North Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE  19899

   Counsel for Appellant

Anthony W. Clark, Esquire  (Argued)
Kristhy M. Peguero, Esquire
Skadden, Arps, Slate, Meagher & Flom
One Rodney Square
P.O. Box 636
Wilmington, DE  19801

Felicia G. Perlman, Esquire
Matthew N. Kriegel, Esquire
Candice Korkis, Esquire
Skadden, Arps, Slate, Meagher & Flom
155 North Wacker Drive, Suite 2700
Chicago, IL   60606

2

Kenneth S. Ziman, Esquire
Skadden, Arps, Slate, Meagher & Flom
4 Times Square
New York, NY 10036

Counsel for Appellees
ICL Holding Co., Inc.,
Boise Intensive Care Hospital Inc.,
CareRehab Services LLC,
Crescent City Hospitals LLC,
LifeCare Healthcare Holdings Inc.,
LifeCare HoldCo LLC,
Lifecare Ambulatory Surgery Center Inc.,
Lifecare Holding Co. of Texas LLC,
Lifecare Holdings Inc,,
Lifecare Hospital at Tenaya LLC,
Lifecare Hospitals LLC,
Lifecare Hospitals of Chester County Inc.,
Lifecare Hospitals of Dayton Inc.,
Lifecare Hospitals of Fort Worth LP,
Lifecare Hospitals of Mechanicsburg LLC,
Lifecare Hospitals of Milwaukee Inc.,
Lifecare Hospitals of Ne Orleans LLC,
Lifecare Hospitals of North Carolina LLC,
Lifecare Hospitals of North Texas LP,
Lifecare Hospitals of Northern Nevada Inc.,
Lifecare Hospitals of Pittsburgh LLC,
Lifecare Hospitals of San Antonio LLC,
Lifecare Hospitals of Sarasota LLC,
Lifecare Hospitals of south Texas Inc.,
Lifecare Investments LLC,
Lifecare Investments 2 LLC,
Lifecare Management Services LLC,

Lifecare Reit 1 Inc., Lifecare Reit 2 Inc.,
Lifecare Specialty Hospital of North Louisiana LLC,
Nextcare Specialty Hospital Of Denver Inc.,
Nextcare Hospitals Muskegon Inc.,
Pittsburgh Specialty Hospital LLC,
San Antonio Specialty Hospital Ltd.,
LifeCare Holding Co. Inc.,
LifeCare Intermediate HoldCo Inc.,

Laura D. Jones, Esquire
Peter J. Keane, Esquire
James E. O'Neill, III, Esquire
Bradford J. Sandler, Esquire
Pachulski Stang Ziehl & Jones
919 North Market Street, Suite 1600
P.O. Box 8705, 17th Street
Wilmington, DE 19801

Counsel for Appellee
Official Committee of Unsecured Creditors

Stanley B. Tarr, Esquire
Michael D. DeBaecke, Esquire
Blank Rome
1201 Market Street, Suite 800
Wilmington, DE 19801

Ira S. Dizengoff, Esquire
Abid Quershi, Esquire
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036

Scott Alberino, Esquire
Ashleigh L. Blaylock, Esquire
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, DC   20036-4000

      Counsel for Appellees
      Steering Committee, Hospital Acquisition LLC

------------

## OPINION OF THE COURT

------------

AMBRO, <u>Circuit Judge</u>

11 U.S.C. § 363 allows a debtor to sell substantially all of its assets outside a plan of reorganization.  In modern bankruptcy practice, it is the tool of choice to put a quick close to a bankruptcy case.  It avoids time, expense, and, some would say, the Bankruptcy Code's unbending rules. The issue at the core of this appeal, which arises from such a sale, is whether certain payments by a § 363 purchaser (here an entity formed by the secured lenders of the debtors) in connection with acquiring the debtors' assets should be distributed according to the Code's creditor-payment hierarchy.

To give some color to this issue, the secured lenders here were owed more than the value of the debtors' assets, making them undersecured.  They acquired the assets by crediting approximately 90% of the secured debt they were owed.  No cash changed hands. (This purchase mechanism is known in bankruptcy parlance as a "credit bid.")  The only cash payments made in connection with the deal were those

5

the secured lenders deposited in escrow for professional fees and paid directly to the unsecured creditors. We conclude, as we explain more fully below, that neither of the two payments went into or came out of the bankruptcy estate. Thus the cash was not subject to the Code's distribution priority.

## I. BACKGROUND

### A. LifeCare's Business Troubles

At the start of 2012, LifeCare Holdings, Inc. ("LifeCare"),[1] once a leading operator of long-term acute care hospitals, was struggling financially. Management blamed its condition on Hurricane Katrina's destruction of three of the company's facilities and growth-stunting federal regulations that followed the 2005 natural disaster. Because of the weight of its debt load ($484 million, of which approximately $355 million was secured), new capital was hard to find. As a result, management considered two transactions that would salvage it as a going concern: a sale or a restructuring of its balance sheet.

The sale didn't happen initially because none of LifeCare's suitors (there were at least seven of them) offered an amount that exceeded its debt obligations. The best offer—submitted by one of LifeCare's biggest competitors—reflected a recovery to the secured lenders of only 80-85%. Management considered that option inadequate and thus was left with the restructuring alternative. To go that route, however, it needed the support of its secured lenders. But they had another idea. Rather than support a restructuring of

---

[1] LifeCare while in Chapter 11 was referred to as "LCI." Per its plan of reorganization it became "ICL." Hence we simply use the term "LifeCare."

6

LifeCare's balance sheet, the secured lenders wanted to purchase the company outright—that is, all of its cash and assets. To that end, they offered to credit $320 million of the $355 million debt they were then owed.

Because their credit bid was LifeCare's best (and only) alternative to liquidation under Chapter 7, the company agreed to part with all of its assets, including cash. To memorialize the proposed sale, the secured lender group (through an acquisition vehicle called Hospital Acquisition, LLC[2]) entered into an Asset Purchase Agreement with LifeCare in December 2012.

In addition to its credit bid, the purchaser agreed to pay the legal and accounting fees of LifeCare and the Committee of Unsecured Creditors (the "Committee") and to pick up the tab for the company's wind-down costs. Because the professionals hadn't completed their work, the agreement directed the purchaser to deposit cash funds into separate escrow accounts. Any money that went unspent had to be returned to it.

## B. LifeCare Files for Bankruptcy

LifeCare and its 34 subsidiaries, which together operated 27 long-term acute care hospitals in 10 states and had about 4,500 employees, filed for bankruptcy one day after entering into the Asset Purchase Agreement.[3] Among the

_____

[2] For convenience, we refer to the buyer interchangeably as the secured lender group, the secured lenders, or simply the purchaser.

[3] The cases were subsequently consolidated for procedural purposes. The separate corporate identities of LifeCare's subsidiaries are irrelevant to this appeal.

company's first requests was permission to sell substantially all of its assets through a Court-supervised auction under 11 U.S.C. § 363(b)(1). After receiving the go-ahead from the Bankruptcy Court, LifeCare marketed its assets to over 106 potential strategic and financial counterparties. In the end, however, the secured lender group's $320 million credit bid remained the most attractive offer. According to the testimony of LifeCare's advisor from Rothschild, Inc., many of the putative bidders were concerned with "reimbursement issues and the challenging regulatory environment facing the long-term acute care industry." Hence they were unwilling to offer LifeCare an amount commensurate with the debt relief put forward by the secured lenders.

Though the secured lender group was selected by default as the successful bidder, the sale was not yet a done deal. Two important players in the bankruptcy case, the Committee and United States Government—neither of which would recover anything if the Court approved the sale—objected to the asset transfer. The former criticized it as a "veiled foreclosure" that would leave the bankruptcy estate so insolvent even administrative expenses would not be paid. The Government, for its part, argued that the sale would result in capital-gains tax liability estimated at $24 million, giving it an administrative claim that would go unpaid. This was unfair, it maintained, because under the proposed sale arrangement equally situated administrative claimants—primarily the bankruptcy professionals—would get paid if the sale went through.

As is not uncommon, however, and before its objections to the sale reached resolution, the Committee struck a deal with the secured lender group. In exchange for the Committee's promise to drop its objections and support the sale, the secured lenders agreed to deposit $3.5 million in trust for the benefit of the general unsecured creditors. The

8

compromise was embodied in a Term Sheet (which we refer to as the "Settlement Agreement" or "Settlement") that was submitted to the Bankruptcy Court together with the sale materials, but later resubmitted in a stand-alone motion for the Court's approval.

## C. The Sale Hearing

On April 2, 2013 the Bankruptcy Court approved the proposed sale from the bench. Applying the "sound business purpose" test, which bankruptcy courts use to decide whether to approve a § 363 sale, *see In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153–54 (Bankr. D. Del. 1999), the Court described LifeCare's condition as getting progressively worse; in bankruptcy talk, it was a "melting ice cube." The only way to avoid liquidation (a potential threat to LifeCare's patients and a result that would leave the unsecured creditors and the Government with nothing) and allow the company to continue as a going concern was through a quick sale. The Court's order approving the sale noted that (1) it was the only alternative to liquidation and best opportunity to realize the full value of LifeCare's assets, (2) the offer accepted was "the best and only one," and (3) a plan of reorganization would not have yielded as favorable an economic result. The Court also found that the parties gave proper notice of the sale and that the purchaser paid a fair and reasonable sum and acted in good faith. Finally, and important for our purposes, the Court addressed the Government's Code-based fairness objection. Deeming the administrative fee monies put in escrow by the purchaser not to be estate property, those funds weren't subject to distribution to LifeCare's creditors, and thus the Government had no claim to any of it.

The Court reserved judgment on the proposed settlement until a later date.

9

## D. The Settlement Hearing

A bankruptcy court's approval of a settlement agreement is not a *fait accompli*. The settlement must be "fair and equitable." *Prospective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). To determine if it is, courts in this Circuit apply the four-factor test set out in *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996), which balances the "value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (internal quotation marks omitted). The test requires a court to weigh (whether in response to a challenge or on its own): "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d at 393.

At the settlement hearing the Bankruptcy Court addressed the Government's argument that, assuming the settlement money was property of the estate (which the Government believed the money was), bypassing it and paying the unsecured creditors disturbed the Code's priority scheme for the payment of creditors. Thus, regardless whether the Settlement satisfied the *Martin* factors, it was unlawful. As the Government's lawyer put it, the "proposed [$3.5 million] settlement attempts to distribute estate property to junior creditors over the objection of a senior creditor in violation of the absolute priority rule[,][4] and so therefore, it

---

[4] A prominent academic (and former Bankruptcy Judge) has aptly described the absolute priority rule as one of "vertical equity," *see* Bruce A. Markell, *A New Perspective on Unfair*

cannot be approved." May 28, 2013 Hr'g Tr. 25:13–16. But the Court rejected this contention, maintaining that, because the Settlement Agreement "permits a distribution directly to the unsecured creditors" from the purchaser, it is "an indication that [the funds] are not property of [LifeCare's] estate[,] and as such, the absolute priority rule . . . is not implicated." *Id.* at 75:4–8. Addressing the *Martin* factors, the Court approved the Settlement, stating that the creditors' objection had a very small chance of success and thus their $3.5 million payday was an excellent outcome.

### E. The Government's Appeal and Stay Request

The Government appealed from both the sale order and the Court's approval of the Settlement and sought to stay the effect of those decisions. At the stay hearing, the Government made clear its intent was not to stop the sale but to alter the part of the sale order that provides for the payment of professional fees and wind-down expenses. Likewise, it argued that the distributional terms of the Settlement Agreement should be modified to follow the Code's payment-priority scheme. But the Court again disagreed with the

---

*Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227, 228-29, 231 (1998)—junior creditors do not receive distributions under plans of reorganization until more senior creditors, unless they consent, are paid or allocated value in full. *See* 11 U.S.C. § 1129(b). This is distinguished from "horizontal equity," Markell, *supra*, at 227-28, 231, whereby creditors of the same priority rank receive proportionally equal distributions of estate property. *See* 11 U.S.C. §§ 1122(a), 1123(a)(4), 1129(b)(1) (each to the extent they concern unfair discrimination); *see also* Ralph Brubaker & Charles Jordan Tabb, *Bankruptcy Reorganizations and the Troubling Legacy of Chrysler and GM*, 2010 U. Ill. L. Rev. 1375, 1403.

11

Government's assessment and denied its stay request. *See* June 11, 2013 Hr'g Tr. at 34:9-12 (noting that there was nothing in the record on which to "base a finding that the funds being held, in effect, in trust for other creditors, for other parties and specifically pursuant to a contract, . . . are [] property of the estate").

The Government appealed the denial of its request for a stay to the District Court. But it too thought the Government had a weak case on the merits, agreeing with the Bankruptcy Court that the funds at issue were not property of the estate and thus not subject to the Code's distribution rules. *See* App. at 11 (deferring to the Bankruptcy Court's ruling, which was based on "a voluminous and uncontested record supplemented by the argument and testimony presented at several hearings . . . that the sale was warranted and the funds at issue belonged to the purchaser [and] not the estate"). Thus the District Court denied the stay request, concluding that the Government didn't make the threshold showing of a sufficient likelihood of success on the merits.

The Government appeals the approval of both the sale order and the Settlement. We have jurisdiction under 28 U.S.C. § 158(d) and 28 U.S.C. § 1291.

## II.    Analysis

The Government raises two issues. Did the Bankruptcy Court err in approving a provision of the sale of LifeCare's assets under which the secured lender group agreed to pay some administrative claims but not others of equal priority? And did it err in approving the distributional terms of the Committee and secured lender group's Settlement, which resulted in a $3.5 million payday for the unsecured creditors even though a senior creditor—namely

12

the Government—received nothing?  Before we can get to these issues, we must resolve the following questions:

> (a)  Is the Government's appeal moot, be it constitutionally, statutorily or equitably?

> (b)  Were the funds paid to administrative claimants under the escrow arrangement approved by the Sale Order, or to the unsecured creditors per approval of the Settlement Agreement, property of LifeCare's estate?

### A. Mootness

LifeCare and the Committee contend that constitutional, statutory and equitable mootness bar our review of the Government's challenge to the escrowed funds set up by the Asset Purchase Agreement as well as the $3.5 million deposited in trust by the purchaser for the unsecured creditors.

### 1. Constitutional Mootness

LifeCare's constitutional mootness argument stems from the secured lender group retaining, after its credit bid is applied, a $35 million first priority lien on all property of the bankruptcy estate.  Thus, LifeCare's argument proceeds, the Government would be entitled to no relief (making its case moot) even if the escrowed funds were deemed estate property, as the funds would go to the secured lenders.  We disagree.  "[A] case 'becomes moot [in the constitutional sense] only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (quoting *Knox v. Serv.*

13

*Employees,* 132 S. Ct. 2277, 2287 (2012)). "'As long as the parties have a [concrete] interest, however small, in the outcome of the litigation, the case is not moot.'" *Id.* (quoting *Knox*, 132 S. Ct. at 2287). We have that here. The Government has a $24 million administrative claim that will go unpaid if the distributional terms of the escrowed funds are left undisturbed. Though the prospect of recovery might be remote, we cannot say it is impossible. Hence the Government's appeal is not constitutionally moot, and we have jurisdiction to consider whether it is entitled to a piece of the pie.

## 2. Statutory Mootness

Moving to statutory mootness, because the underlying asset sale was conducted under § 363(b) of the Bankruptcy Code, which authorizes the sale of estate property outside the ordinary course of business, it implicates 11 U.S.C. § 363(m). That provision moots any challenge to a § 363 sale that "affect[s] the validity of [the] sale" so long as "the purchaser acted in good faith and the appellant failed to obtain a stay of the sale." 3 Collier on Bankruptcy ¶ 363.11 (16th ed. 2013).

Subsection (m) reads in full (save for words not relevant here):

> The reversal or modification on appeal of an authorization . . . of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

14

11 U.S.C. § 363(m). "[I]ts certainty attracts investors and helps effect[] debtor rehabilitation." *Cinicola v. Scharffenberg*, 248 F.3d 110, 122 (3d Cir. 2001) (citing Collier at ¶ 363.11). Without it, the risk of litigation would chill prospective bidders or push them to "demand a steep discount." *In re River West Plaza-Chicago, LLC*, 664 F.3d 668, 671 (7th Cir. 2011) (quoting *In re Sax*, 796 F.2d 994, 998 (7th Cir. 1986)).

To give effect to § 363(m)'s purpose, some courts "limit[] the appealability of a Section 363 sale order . . . to the issue of the purchaser's good faith." *In re Motors Liquidation Co.*, 430 B.R. 65, 78 (S.D.N.Y. 2010). Under that view, if the objecting party fails to obtain a stay of the sale, appellate review "is statutorily limited to the narrow issue of whether the property was sold to a good faith purchaser." *Id.* (quoting *Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci*), 105 F.3d 837, 839 (2d Cir. 1997)). By contrast, we interpret subsection 363(m) more broadly and will review any sale-challenge that doesn't "affect the validity of the sale." *Cinicola*, 248 F.3d at 128. Stated another way, so long as we can "grant effective relief," § 363(m) doesn't bar appellate review. *Pittsburgh Food & Beverage, Inc. v. Ranallo*, 112 F.3d 645, 651 (3d Cir. 1997). Thus the question we need to answer is whether we can give the Government the relief it seeks—"a redistribution" of the escrowed funds for administrative expenses and settlement proceeds to unsecured creditors, Reply Br. at 11—without disturbing the sale.

LifeCare and the Committee both argue we cannot. LifeCare contends that, if we reallocate the escrowed funds, this will change a "fundamental term[] of the transaction" and deprive it of a key bargained-for benefit. LifeCare Br. at 5. Similarly, the Committee asserts that the settlement "cannot be reversed without affecting the validity of the sale," Committee Br. at 12, and, like LifeCare, it will be deprived of

a key deal term, as it "would not have withdrawn its objection to the sale without payment," *id.* at 14.

We disagree with both positions. The provision stamps out only those challenges that would claw back the sale from a good-faith purchaser. It does not moot "*every* term that might be included in a sale agreement," even if each is technically "integral to that transaction." Reply Br. at 10 (emphasis in original). And, while § 363(m) aims to make sales of estate property final and inject predictability into the sale process, we don't think it does so at all costs and certainly not for non-purchasers. Thus we fail to see how § 363(m) bars our review.

### 3. Equitable Mootness

Finally, the Committee contends the Government's appeal is equitably moot because the Government was unsuccessful in obtaining a stay of the Settlement Order and it's too late to undo the compromise because over $2 million has already been distributed. But, even if it is right about the consequences, the Committee's reliance on the doctrine of equitable mootness misses the mark. *In re SemCrude, L.P.*, 728 F.3d 314 (3d Cir. 2013), makes clear that the doctrine "comes into play in bankruptcy (so far as we know, its only playground) after a plan of reorganization is approved." *Id.* at 317. Outside the plan context, we have yet to hold that equitable mootness would cut off our authority to hear an appeal, and do not do so here. And though we are sympathetic to the Committee's position that it cannot recover its ability to object to a sale it viewed as unfair, we also note that without the Settlement Agreement it would have received nothing, thus cancelling (or at least mitigating) the claimed unfairness of considering the Government's appeal.

16

## B. The Merits

On the merits the Government argues that the escrowed funds and settlement money were proceeds paid to obtain LifeCare's assets, and thus qualify as estate property that should have been (but wasn't) paid out according to the Code's creditor-payment scheme. Included within that scheme, the argument proceeds, are that equally ranked creditors must receive equal payouts and lower ranked creditors can't be paid a cent until higher ranking creditors are paid in full. The Government contends both principles were violated—the former because the similarly situated bankruptcy professionals were paid though the Government was not, the latter because it received none of the settlement money earmarked for the lower priority unsecured creditors.

The Government's argument relies on two key premises. The first is that the escrowed funds for professionals and settlement proceeds for unsecured creditors were property of the estate. (The Code's distribution rules don't apply to nonestate property.) The second is that the priority-enforcing Code rules apply here even if textually most (save for § 507) are limited to the plan context. We begin (and end) with the first issue.

### 1. Are either the escrowed funds or settlement proceeds property of LifeCare's estate?

11 U.S.C. § 541(a)(6) defines property of the estate as "proceeds . . . of or from property of the estate." Thus, if either the escrowed funds or settlement sums are "proceeds of or from property of the estate," they qualify as estate property. We go out of turn and start with the settlement monies, as this is the easier issue.

17

### a. The Settlement Sums

The Bankruptcy Court held that, because the settlement monies were paid directly to the unsecured creditors from a trust funded by the purchaser and not given in exchange for any estate property, those funds were not property of LifeCare's estate. The Government contends the Court erred because the secured lenders' payment to the Committee was in substance an increased bid for LifeCare's assets. In other words, the purchaser "agreed to a price it was willing to pay to acquire the debtors' assets," but "later had to increase its offer . . . to secure its successful bid." Gov't Br. at 36. Thus, the argument goes, the settlement sums should be treated as estate property.

We are not persuaded. Though it is true that the secured lenders paid cash to resolve objections to the sale of LifeCare's assets, that money never made it into the estate. Nor was it paid at LifeCare's direction. In this context, we cannot conclude here that when the secured lender group, using that group's own funds, made payments to unsecured creditors, the monies paid qualified as estate property. For these points we find instructive *In re TSIC*, 393 B.R. 71 (Bankr. D. Del. 2008). There, as here, the unsecured creditors launched objections to the winning bid at a § 363 auction. *See id.* at 74. Before the sale closed, the purchaser and creditors' committee agreed that the latter would drop its objection if the former funded a trust account for the benefit of unsecured creditors. *See id.* The United States trustee, relying principally on *In re Armstrong World Indus., Inc.*, 432 F.3d 507 (3d Cir. 2005), contended that the settlement violated the proscription against paying lower-statured creditors before higher ones. But the Bankruptcy Court disagreed. It held that, in contrast to *Armstrong*—which dealt with a gift of *estate* property from a senior creditor to a junior creditor over an intermediate creditor's objection—the

purchaser's "funds [were] not proceeds from a secured creditor's liens, do not belong to the estate, and will not become part of the estate even if the Court does not approve the Settlement." *In re TSIC,* 393 B.R. at 77. And the trustee presented no evidence that the settlement funds "were otherwise intended for the Debtor's estate." *Id.* at 76. All are true here: the settlement sums paid by the purchaser were not proceeds from its liens, did not at any time belong to LifeCare's estate, and will not become part of its estate even as a pass-through.

Moving to the Government's next argument, we are similarly unpersuaded by its reliance on the Committee's purported concession in its settlement-approval motion that the parties' compromise "represents an agreement between the Buyer, the Lenders and the Committee *to allocate proceeds derived from the sale*." App. at 519 (emphasis added). Like the Bankruptcy Court, we decline to elevate form over substance and give legal significance to the Committee's description of the settlement funds. Our focus is on whether the settlement proceeds were given as consideration for the assets bought at the § 363 sale. The evidence we have leads us to conclude they were not.

### b. The Escrowed Funds

Whether the professional fees and wind-down expenses (which make up the escrowed funds) qualify as property of the estate is a more difficult question. As noted, the Bankruptcy Court held that the funds did not so qualify because they "belong[ed] to the purchaser[] [and] not to the debtors' estate." June 11, 2013 Hr'g Tr. 34:1. The Government urges us to reverse that ruling because the funds were listed in subsections 3.1(a) and (b) of the Asset Purchase Agreement as part of the purchase price (indeed, they were called "[c]onsideration") for LifeCare's assets and thus

19

qualify as estate property under Bankruptcy Code § 541(a)(6) (including as property of the estate "proceeds" from a debtor's asset sale). Though aspects of the Government's argument are factually correct, we cannot ignore the economic reality of what actually occurred.

Subsection 2.1(*l*) of the Asset Purchase Agreement makes clear that the secured lender group purchased all of LifeCare's assets, including its cash, by crediting $320 million owed by LifeCare to the secured lenders. Thus, once the sale closed, there technically was no more estate property. Put another way, getting $320 million of its secured debt forgiven resulted in the secured lender group getting all the property of LifeCare. This is an important point. The Government's argument presumes that any residual cash from the sale—namely the monies earmarked for fees and wind-down costs—would become property of LifeCare. *See* Reply Br. at 20–21 (arguing that "if [the value of LifeCare's] cash is said to have been paid as part of the 'purchase price,' . . . it cannot be said to *remain* the property *of the purchaser*") (emphases added). But that is impossible because LifeCare agreed to surrender all of its cash. And, per the sale order, whatever remains of the $1.8 million in escrow goes back to where it came from—the secured lenders' account (as indeed happened by the time of oral argument to over $800,000 placed into escrow). Thus, as a matter of substance, we cannot conclude that the escrowed funds were estate property.

All that said, we recognize that, in the abstract, it may seem strange for a creditor to claim ownership of cash that it parted with in exchange for something. *See* Reply Br. at 21. But in this context it makes sense. Though the sale agreement gives the impression that the secured lender group agreed to pay the enumerated liabilities as partial consideration for LifeCare's assets, it was really "to facilitate . . . a smooth . . . transfer of the assets from the

20

debtors' estates to [the secured lenders]" by resolving objections to that transfer. June 11, 2013 Hr'g Tr. 23:9–13. To assure that no funds reached LifeCare's estate, the secured lenders agreed to pay cash for services and expenses through escrow arrangements.

In this respect, an interesting argument the Government could have made, but didn't, is that the escrowed funds resemble elements of an ordinary carve-out—best understood as "an arrangement under which secured creditors permit the use of a portion of their collateral [that is, *estate property*] to pay administrative costs, such as attorney fees," and something the Bankruptcy Code allows debtors and secured lenders to agree to in the normal course.[5] Harvey R. Miller & Ronit J. Berkovich, *The Implications of the Third Circuit's Armstrong Decision on Creative Corporate Restructuring: Will Strict Construction of the Absolute Priority Rule Make Chapter 11 Consensus Less Likely?*, 55 Am. U. L. Rev. 1345, 1390-1412 (2006); *see also* Richard B. Levin, *Almost All You Ever Wanted to Know About Carve Out*, 76 Am. Bankr. L.J. 445, 449 (2002) (maintaining that while "the carve out protects the professionals, [] *it also may benefit the secured creditor*, which might have concluded that an orderly liquidation or restructuring process is likely to result in the highest net recovery on its claim, even after

---

[5] Typically a carve-out is established at the outset of a bankruptcy case in a cash-collateral order where "a specific amount of the cash collateral, either in existence or to be generated, is earmarked for the payment of counsel fees." *In re U.S. Flow Corp.*, 332 B.R. 792, 795 (Bankr. W.D. Mich. 2005) (quoting *Harvis Trien & Beck, P.C. v. Federal Loan Mortgage Corp. (In re Blackwood Assocs., L.P.)*, 187 B.R. 856, 860 (Bankr. E.D.N.Y. 1995)).

21

payment of carve out expenses" (emphasis added)); Charles W. Mooney, Jr., *The (Il)Legitimacy of Bankruptcies for the Benefit of Secured Creditors*, 2015 U. Ill. L. Rev. 735, 750 (noting that "[i]t is not unusual for a secured creditor to carve out from proceeds of its collateral funds to cover professional fees and other administrative expenses"). Thus, the argument would go, if the escrowed funds indeed resemble an ordinary carve-out, then for that reason alone they should be treated as estate property.

Ultimately the argument fails, for the difference between a carve-out and what we have here is the obvious. We are not dealing with collateral (if we were, this would suggest it was LifeCare's property) but with the purchaser's property because the payments by the purchaser were of its own funds and not LifeCare's bankruptcy estate.[6]

\* \* \* \* \*

---

[6] *In re DBSD North America, Inc.*, 634 F.3d 79 (2d Cir. 2011), a case the Government relies on heavily, is not to the contrary. The only question there was whether, in the context of a plan of reorganization, an "undersecured . . . [creditor] entitled to the full residual value of the debtor [was] free to 'gift' some of that value" to a shareholder of the debtor. *Id.* at 94. While the Second Circuit Court answered no—holding that "secured creditors could have demanded a plan in which they received all of the reorganized corporation, but, having chosen not to, they may not surrender part of the value of the estate for distribution to the stockholder as a gift," *id.* at 99 (internal quotation marks omitted)—the Court said nothing about whether a lender can distribute *non*estate property to a lower-ranked creditor.

As noted, the Bankruptcy Code's creditor-payment hierarchy only becomes an issue when distributing estate property. Thus, even assuming the rules forbidding equal-ranked creditors from receiving unequal payouts and lower-ranked creditors from being paid before higher ranking creditors apply in the § 363 context, neither was violated here.