PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3953
_____

In re:  PURSUIT CAPITAL MANAGEMENT, LLC,
Debtor

ANTHONY SCHEPIS; FRANK CANELAS; PURSUIT
INVESTMENT MANAGEMENT, LLC; PURSUIT
OPPORTUNITY FUND, I, LP; PURSUIT CAPITAL
MANAGEMENT FUND, I, LP,
Appellants

v.

JEOFFREY L. BURTCH, Chapter 7 Trustee
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-15-cv-00801)
District Judge:  Hon. Richard G. Andrews
_____

Argued
June 12, 2017

Before:  JORDAN, KRAUSE, *Circuit Judges* and
STEARNS[*], *District Judge.*

(Filed: October 24, 2017)
_____

Daniel N. Brogan
Stuart M. Brown
R. Craig Martin   [ARGUED]
DLA Piper
1201 N. Market St. – Ste. 2100
Wilmington, DE   19801
     *Counsel for Appellants*

Mark E. Felger
Barry M. Klayman
Cozen O'Connor
1201 N. Market St. – Ste. 1001
Wilmington, DE   19801

Wendy B. Reilly   [ARGUED]
Debevoise &  Plimpton
919 Third Ave.
New York, NY  10022
     *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

_____

     [*]Honorable Richard G. Stearns, United States District
Court Judge for the District of Massachusetts, sitting by
designation.

JORDAN, *Circuit Judge*.

This case seems at first blush to be about the validity of the sale of legal claims listed as assets in a bankruptcy estate, but, at this point, it is really about whether such merits issues have been preserved for present review. The appointed Trustee reached an agreement to sell the claims to certain of the debtor's creditors (the "Creditor Group"[1]). After the Trustee sought court approval of the sale, the parties against whom the claims are now being asserted (the "Pursuit Parties"[2]) objected to the sale and sought to purchase the

------

[1] The creditors involved in the agreement are as follows: 1) Harris, O'Brien, St. Laurent & Chaudhry LLP; 2) Reed Smith LLP; 3) Alpha Beta Capital Partners, L.P.; 4) Claridge Associates, LLC; 5) Jamiscott LLC; 6) Leslie Schneider and Lilian Schneider, individually and as representatives of Leonard Schneider's estate. The notice of appeal lists as interested parties the following: Reed Smith, LLP; Alpha Beta Capital Partners, L.P.; Claridge Associates, LLC; Jamiscott LLC; Leslie Schneider; Lilian Schneider; and the Estate of Leonard Schneider. Appellants state that the creditors are "mostly former limited partners in funds for which the Debtor acted as general partner and who were already engaged in litigation with the former princip[al]s of the Debtor[.]" (Opening Br. at 5.) The Trustee describes them as "the Debtor's two non-insider creditor constituencies." (Answering Br. at 4.)

[2] The Pursuit Parties are the appellants and consist of Anthony Schepis, Frank Canelas, Pursuit Investment Management, LLC, Pursuit Opportunity Fund I, L.P., and Pursuit Capital Management Fund I, L.P.

claims themselves. The various players engaged in negotiations and a bidding process, and the Trustee eventually decided to sell the claims to the Creditor Group for $180,001. Over objections raised by the Pursuit Parties, the Bankruptcy Court approved the sale. The Pursuit Parties did not seek a stay, and the sale closed. The Creditor Group then immediately sued on the claims in the Bankruptcy Court.

The Pursuit Parties appealed to the District Court, challenging, among other things, the Trustee's ability to sell the claims. The District Court dismissed the appeal as statutorily moot under 11 U.S.C. § 363(m), because the Pursuit Parties had not obtained a stay and their requested remedy, if entered, would affect the validity of the sale. The Pursuit Parties now appeal to us. Like the District Court, we conclude that the appeal is statutorily moot under 11 U.S.C. § 363(m) and must therefore be dismissed.

## I.    Background[3]

### A.    The Bankruptcy Filing and Initial Agreement

Pursuit Capital Management, LLC ("Pursuit" or the "Debtor") is a Delaware limited liability company and former

---

[3] We recite the background according to the factual findings of the Bankruptcy Court, none of which have been shown to be clearly erroneous. *See Cinicola v. Scharffenberger*, 248 F.3d 110, 115 n.1 (3d Cir. 2001) ("We review the bankruptcy court's findings of fact under a clearly erroneous standard[.]").

4

general partner in investment funds. Anthony Schepis and Frank Canelas founded Pursuit and acted as its managing members. Pursuit in turn formed Pursuit Capital Management Fund I, L.P. and, later, Pursuit Opportunity Fund I, L.P. Those two funds were created to "acquire securities for trading and investment appreciation." (Opening Br. in Support of Mot. to Dismiss, Docket No. 8 at 5, *Claridge Assocs., LLC v. Schepis (In re Pursuit Capital Management, LLC)*, No. 16-50083 (Bankr. D. Del.) (hereinafter "*In re Pursuit*").) They "invest[ed] substantially all of their assets in offshore entities formed under the laws of the Cayman Islands." (*Id.*) Pursuit was the general partner of those entities and focused on their day-to-day management.

Pursuit voluntarily petitioned for Chapter 7 bankruptcy on March 21, 2014, after it became liable on legal judgments for $5 million. Jeoffrey L. Burtch was appointed as the Trustee of the Pursuit estate. When Pursuit filed its schedules of assets and statements of financial affairs, it listed essentially no assets but indicated that it had a "[p]otential indemnification claim" against one of the funds it managed (JA at 84), as well as claims connected to two other cases. The financial statements revealed that Pursuit's gross income for 2011 was $645,571.22 from Pursuit Capital Management Fund I, L.P., "which was subsequently transferred to [Pursuit's] members" in early 2013. (JA at 102.) According to the Creditor Group, Schepis and Canelas, as the sole owners and managers of the company, "enrich[ed] themselves at the expense of the Debtor's creditors, and engaged in corporate machinations to avoid paying money owed to the Debtor[.]" (Complaint, *In re Pursuit*, Docket Nos. 1 & 2.) More specifically, the Creditor Group said that Schepis and Canelas "secretly transferred to themselves ... $645,571 in

5

cash held in the Debtor's bank account, in exchange for no consideration." (*Id.*) That transfer may trigger an avoidance claim under the Bankruptcy Code, which allows a trustee to rescind certain transfers of property from a debtor's estate. *See, e.g.*, 11 U.S.C. §§ 544, 547, and 548. According to the Trustee, selling the potential avoidance claim was advisable because the bankruptcy estate had no funds available to "administer the estate, let alone [to] pursue the claim[] and litigation[.]" (JA at 181.)

The Trustee negotiated with the Creditor Group, and, on March 2, 2015, he filed a motion for a court order approving an agreement to "settle, transfer and assign" the avoidance claim and other potential claims to that group.[4] (JA at 182.) The Creditor Group agreed to purchase the claims for $125,000 in exchange for a concession that it "shall be permitted to bring the ... [c]laims in the Bankruptcy Court, and [is] deemed to have standing to bring such claims in the Bankruptcy Court." (*Id.*) The Trustee stated in his motion for approval of the sale that, "[i]n [his] business judgment, the [Creditor Group's offer] represent[ed] a fair

---

[4] All told, the claims at issue against Pursuit and its affiliates include the following: "claims asserted in ... [a separate action] (the 'New York action');" potential indemnification claims against Pursuit Capital Management Fund I, L.P.; the potential avoidance claim; and an asserted interest in potential proceeds from a then-pending separate litigation called the "UBS litigation[.]" (JA at 495-98.) The primary focus here is on the avoidance claim. The Creditor Group is currently pursuing the claims as "fraudulent transfers ... [p]ursuant to 11 U.S.C. §§ 544, 548[.]" (*In re Pursuit*, Docket No. 1 at 23-24).)

6

and reasonable price for the claims[.]" (JA at 185.) The Trustee also stated that he was willing to entertain "additional proposals for the assets on similar terms" as an "additional test of ... fairness[.]" (JA at 188.)

Ten days later, on March 12, 2015, the Pursuit Parties filed an objection to the Trustee's sale motion, arguing primarily that a lack of good faith undermined the fairness of the agreement, and that the deal did not maximize the value of the estate. In light of that objection, the Bankruptcy Court directed that the Trustee entertain purchase offers from the Pursuit Parties. After discussions between the Trustee and the Pursuit Parties, during which the Pursuit Parties offered $147,500 for the claims, the Trustee decided that an auction was the best means to maximize value for the estate. He sought and received the Bankruptcy Court's permission to conduct one.

## B.    The Auction

To establish ground rules, the Trustee filed a motion for approval of proposed auction procedures, including a provision that the Trustee be allowed to modify the procedures "as he deem[ed] appropriate to comply with his fiduciary obligation[,]"[5] to determine in his "sole discretion" the highest and best bid, to reject any bid that he deemed

---

[5] "The Trustee proposes that the auction of the Estate's assets be governed by the following procedures ... subject to modification by the Trustee as he deems appropriate to comply with his fiduciary obligation[.]" (JA at 241.)

7

inadequate,[6] and to negotiate individually or openly with each bidder.[7] (JA at 241.) The Bankruptcy Court approved that motion "in [its] entirety." (JA at 254.)

The auction took place by teleconference on July 7, 2015, with the Pursuit Parties and the Creditor Group as the only interested bidders. The Trustee initially stated that the Pursuit Parties' prior offer of $147,500 was the highest and best, and the bidding proceeded from there in $10,000 increments. Before it could be concluded, the auction abruptly adjourned because the lawyer for the Pursuit Parties asserted that he had a scheduling conflict.[8] But, the Trustee

_____

[6] "The Trustee reserves the right to (i) determine in his sole discretion which bid(s) is/are the highest and otherwise best, and (ii) reject at any time, without liability, any bid that the Trustee, in his business judgment, deems to be (1) inadequate or insufficient, (2) not in conformity with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or these procedures, or (3) contrary to the best interests of the Estate[.]" (JA at 242.)

[7] "The auction may include individual negotiations with each bidder and/or open bidding; provided, however, that all bids shall be made and received in one room, on an open basis, and each bidder shall be entitled to be present for all bidding, and all material terms of each bid shall be fully disclosed to all bidders[.]" (*Id.*)

[8] An acrimonious tone arose early in the auction process when the Pursuit Parties' counsel, Peter Cane, refused to identify his clients during the introductory appearances at the teleconference. Then the auction was adjourned when

8

Mr. Cane hung up to attend a scheduling conference in a related case. The following exchange between Mr. Cane and Jon Harris, counsel to the Creditor Group, took place before the auction adjourned:

> Mr. Cane: So you know, I have a conference with the New York court at three o'clock at Jon Harris's request, and we agreed to it. I am not going to skip that. The Court scheduled it.

> Mr. Harris: That is a scheduling conference. Sarah Coleman can handle that, or anyone else, and I'm sure it will be quite brief as well.

> Mr. Cane: Don't tell me who can handle what. This is about sanctions against you for fraudulently misrepresenting facts to the court. Don't make it worse for yourself.

> (Recess)

> Mr. Felger: [Mr. Cane], are you on the line? How about Sarah? I'm hearing nothing. I received an e-mail from [Mr. Cane] at 3:27. It says, "Mark, the New York court has asked us to try again at four o'clock, which means I need to call my adversary at 3:55. I am not sure how long it will take. I know I will be completely clear, as will my client, between 8:30 and nine o'clock, so I suggest we resume then if that is agreeable to everyone else. As you said, these auctions often go to midnight[.]"

stated before adjourning that the Pursuit Parties' last bid of $170,000 was preferred to any others that had been made to that point.

The Trustee subsequently proposed eight alternative dates as options to reconvene the auction, though none was acceptable to all of the parties. Instead of postponing the process further, on July 24, 2015, the Trustee requested final sealed bids from the parties, to be delivered no later than July 30, 2015. On that date, the Trustee received one sealed bid from the Creditor Group for $180,001 and he received nothing from the Pursuit Parties. In fact, not only did the Pursuit Parties fail to submit a bid, they also informed the Trustee that they were withdrawing their prior bids from consideration. Not surprisingly, then, the Trustee agreed to sell the claims to the Creditor Group, after some additional negotiations and modifications to the bid. A day later, the Trustee announced that he would seek approval of the sale agreement at a hearing on August 10, 2015.

The sale agreement between the Trustee and the Creditor Group specified that the Creditor Group would acquire a set of claims, including the avoidance claim that is the primary focus of the merits arguments in this case. The agreement also stated that the Creditor Group would pursue the claims "at their cost and expense [and] ... [a]ny net recovery will be paid into the estate for distribution to all creditors[.]" (JA at 423-24.) Additionally, the agreement contained no representations or warranties regarding the

_____

(JA at 399-400.)

claims, and they were to be sold on an "as is[,] where is" basis. (JA at 501.)

Before the date of the sale approval hearing, the Pursuit Parties filed a motion to adjourn it, which prompted a hearing to address that request. The Trustee stated at that time that he had been prepared to move forward with the Creditor Group's sealed bid, but he was wavering because the Pursuit Parties had just "made a new offer" by email that had different terms from their previous offer and was for "a higher dollar amount than the proposal by the [C]reditor [G]roup."[9] (JA at 492, 514.) Citing the "difficult spot" that he was in because "[his] job ... is to maximize value[,]" the Trustee deferred to the Bankruptcy Court's judgment, stating that he was not opposed to a temporary adjournment so long as a definitive date was set to resolve the matter. (JA at 514-16.) The Creditor Group strongly opposed the Pursuit Parties' motion for an adjournment, arguing that there had been delay enough, that each delay harmed the value of the claims they sought to purchase, and that they should prevail in the auction because they had abided by the rules during the final sealed bidding process.

The Bankruptcy Court rejected the Pursuit Parties' request to adjourn the sale hearing. The Court stressed that the Pursuit Parties did not submit a final bid when requested and that there was concern with "the way th[e] Court and other parties' schedules and th[e] Court's orders [were] being ignored, to some extent, by the Pursuit Parties." (JA at 521.) The Bankruptcy Court thus ruled that the sale hearing would

---

[9] That new offer amounted to $200,000.

11

go forward and, if the Trustee wanted to change his mind about selling to the Creditor Group, he could do so. After that hearing, the Pursuit Parties made a new offer of $220,000 to the Trustee, again via email, conditioned on the Trustee declaring the Pursuit Parties to be the prevailing bidder. The Trustee ultimately rejected that offer.

## C.    The Sale Approval Hearing

The hearing to approve the sale took place on August 10, 2015. At the outset, the Pursuit Parties asked the Court to reopen the auction rather than proceed with the hearing. They then and there presented the Trustee with yet another offer – apparently one that had not been discussed previously – in the amount of $205,750 and with modified terms that would "settle[] ... [the] avoidance claim[.]"[10] (JA at 441-43.) After reviewing the new offer, the Trustee again acknowledged that he was in a difficult situation, but then stated that he was "prepared to move forward on the motion [to approve the sale agreement,]" if the Court agreed, because, "in the end ... the few dollars won't make a bit of difference to the creditors of th[e] estate, and the creditors of th[e] estate are in the [C]reditor [G]roup[.]"[11] (JA at 449.)

_____

[10] The bid was lower monetarily than the last one the Pursuit Parties had made, but it contained new terms that the Pursuit Parties presumably viewed as more valuable.

[11] The Trustee noted that, if the Pursuit Parties' offer were accepted, the estate would lose out on the potential recovery that would return to it under the deal with the Creditor Group, which involved the bankruptcy estate sharing

12

The Bankruptcy Court, after reviewing the history of the case, including the Pursuit Parties' litigating and bidding behavior, rejected their request to reopen the auction. The sale approval hearing continued with the Court allowing the Trustee to testify and be subject to cross-examination. While cross-examining the Trustee, counsel for the Pursuit Parties attempted to present yet another offer, this time for $250,000, but the Court did not permit counsel to bid "from the podium." (JA at 471.) After the Trustee's testimony, the Pursuit Parties laid out, among other arguments, three objections to approval of the sale motion: 1) the bid accepted by the Trustee was not the highest bid; 2) the auction procedures had not been complied with; and 3) an avoidance claim cannot be prosecuted by parties other than the trustee, in a Chapter 7 context.

The Trustee countered by stating that the Creditor Group's bid was the best and highest that was offered "in accordance with the rules."[12] (JA at 484.) He agreed that the claim was sold on an "as-is, where-is" basis (JA at 485), but,

_____

in the recovery on claims against the Pursuit Parties. That potential recovery is approximately $645,000.

[12] During their argument, the Pursuit Parties had emphasized that the estate was insolvent and thus a higher bid should be favored. Counsel for the Trustee acknowledged that the estate was administratively insolvent but argued that it would be so regardless of whether the Trustee had accepted the Pursuit Parties' offer of $205,750 offered at the start of the hearing.

at least under the Creditor Group's bid, there was a possibility for recoveries from the claims that would be advanced against the Pursuit Parties and would "flow into the estate and be shared by creditors[.] Under [the Pursuit Parties'] revised proposal ... there would be no opportunity for additional monies flowing into the estate." (JA at 484-85.) The Trustee also argued that, when changes to the procedures were made, they were in accordance with the modification provision in those court-approved rules. (JA at 484-86.)

When the arguments concluded, the Bankruptcy Court granted the Trustee's motion to approve the sale agreement. The Court applied the "sound business purpose test[,]" *In re ICL Holding Co.*, 802 F.3d 547, 551 (3d Cir. 2015) (citing *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153-54 (Bankr. D. Del. 1999)), and, in relevant part, found that the Trustee had exercised sound business judgment and that the sale price was fair because $180,001 – with a potential additional recovery – was substantially higher than the original $125,000 offer. The Court also found that, because there was no evidence of collusion, the Trustee and the Creditor Group had acted in good faith.

After reviewing those factors, the Bankruptcy Court responded to the Pursuit Parties' arguments and objections. It reiterated its denial of the request to reopen the auction, reasoning that the need to uphold the integrity of the auction process outweighed the potential of a higher bid under the circumstances. In the same vein, the Court stated that it had "no reason to quarrel with the trustee's decision that the offers made by the Pursuit Parties subsequent to the closing of the auction are not highest and better[,]" taking into account the potential additional recovery to the estate from a

14

successful suit on the claims. (JA at 428.) The Court also rejected the Pursuit Parties' complaint about the modification of the auction procedures because the Trustee had been empowered to make such a change when the auction procedures were first presented for approval. While it agreed that the Pursuit Parties should be able to raise "any and all defenses they have to whatever litigation is brought," the Bankruptcy Court did not take a position on whether an avoidance claim could be prosecuted by parties other than the Trustee. (JA at 429.) With that, the Court approved the sale and entered an order (the "Sale Order") to that effect on August 27, 2015.

### D. The Appeals and the Creditor Group's Assertion of the Purchased Claims

The Pursuit Parties promptly appealed the Sale Order to the District Court. Of utmost importance, however, they did so without first seeking a stay of the order. In their appeal, the Pursuit Parties argue "that the Bankruptcy Court erred in entering the Sale Order because the Trustee alone is authorized to prosecute the causes of action arising under the Bankruptcy Code, and the Trustee lacked authority to assign the causes of action to a non-fiduciary third party." (JA at 52.) They also argue that the Bankruptcy Court's findings of good faith are erroneous. Within those arguments are challenges to the integrity of the auction process as well as an allegation that the auction procedures were applied to them prejudicially.

Meanwhile, the Creditor Group has promptly pursued the claims it purchased. They filed an adversary proceeding

against the Pursuit Parties in the Bankruptcy Court,[13] and that case has progressed concurrently with the appeal of the Sale Order to the District Court and then the appeal to us. In the adversary proceeding, the Pursuit Parties moved to dismiss, arguing that the Creditor Group "do[es] not own the causes of action asserted in the complaint and [is] not entitled to prosecute [it,]" (JA at 53), because avoidance powers are reserved "solely and exclusively" for a bankruptcy trustee. (JA at 52.) In the alternative, they moved to stay the adversary proceedings pending their appeals.

The District Court ruled that the appeal of the Sale Order is statutorily moot under 11 U.S.C. § 363(m) because no stay had been obtained and any reversal or modification of the sale would naturally affect the validity of the sale. The District Court also rejected the Pursuit Parties' arguments attacking the good faith and the integrity of the auction process and its procedures. The Court specifically declined to rule on whether a trustee can properly transfer avoidance claims and whether non-trustee parties can prosecute such claims. It recognized that the Pursuit Parties were attempting to get a merits ruling:

> [I]t would seem that [a request by the Pursuit Parties that the Court decide the Creditor Group has no power to prosecute the claims even though they may own them] is essentially that [it] decide the motion to dismiss that is currently pending in [the] separate case before

---

[13] The case is *Claridge Associates, LLC v. Schepis* (*In re Pursuit Capital Management, LLC*), No. 14-10610, Adv. No. 16-50083 (Bankr. D. Del.).

16

the Bankruptcy Court. I do not think that this is procedurally appropriate relief.

(JA at 55.) Instead, the District Court determined that:

> finding that the Trustee lacked authority to transfer the causes of action though not nullifying the sale would affect its validity and demonstrate that the sale was flawed. Such a finding would impact the terms of the bargain struck by the buyer and seller. If the Bankruptcy Court had declined to approve the sale of the causes of action, [the Creditor Group] would undoubtedly have valued what they were purchasing at a lower amount.

(JA at 56 (internal quotation marks and citations omitted).)

In light of the District Court's refusal to address the merits, the Pursuit Parties again pressed in the Bankruptcy Court the issue of a trustee's ability to transfer his avoidance powers. The Bankruptcy Court requested supplemental briefing on that issue and conducted a hearing on it, but the Court has deferred ruling on the issue pending our decision in this appeal. (Memorandum, *In re Pursuit*, Adv. No. 16-50083, Docket No. 103.)

## II.     Discussion[14]

The Pursuit Parties present numerous arguments regarding a trustee's ability to transfer avoidance powers, but we cannot consider them if the appeal of the Sale Order is moot under 11 U.S.C. § 363(m).  *See Cinicola v. Scharffenberger*, 248 F.3d 110, 127 n.19 (3d Cir. 2001) ("[W]e must first answer the question of statutory mootness before proceeding to the merits[.]").  That is the primary issue before us, and we conclude that the appeal is indeed statutorily moot.

### A.     The Test

Section 363(m) provides:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not

---

[14] The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b).  The District Court heard the appeal under 28 U.S.C. § 158(a)(1).  We exercise jurisdiction over the District Court's final decision pursuant to 28 U.S.C. § 158(d).  "Our review of the District Court's ruling in its capacity as an appellate court is plenary[.]" *In re Seven Fields Dev. Corp.*, 505 F.3d 237, 253 (3d Cir. 2007) (quoting *In re O'Lexa*, 476 F.3d 177, 178 (3d Cir. 2007)).  "[W]e review the bankruptcy judge's legal determinations de novo," *id.*, "and 'its factual findings for clear error and its exercise of discretion for abuse thereof.'" *Id.* (quoting *In re United Healthcare Sys., Inc.*, 396 F.3d 247, 249 (3d Cir. 2005)).

affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  The purpose of § 363(m) is to promote the finality of sales.  It provides "not only … finality to the judgment of the bankruptcy court, but particularly … finality to those orders and judgments upon which third parties rely." *Pittsburgh Food & Bev. Inc. v. Ranallo*, 112 F.3d 645, 647-48 (3d Cir. 1997) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)); *see also In re Stadium Mgmt. Corp.*, 895 F.2d 845, 847 (1st Cir. 1990) (discussing the "salutary policy of affording finality to judgments" in such sales (citation omitted)).  "[I]ts certainty attracts investors and helps effectuate debtor rehabilitation."[15]  *Cinicola*, 248 F.3d

---

[15] As well put by the United States Court of Appeals for the Fourth Circuit:

> Section 363(m) codifies Congress's strong preference for finality and efficiency in the bankruptcy context, particularly where third parties are involved.  Without the protection of § 363(m), purchasers of bankruptcy estate assets could be dragged into endless rounds of litigation to determine who has what rights in the property.  This would not only impose unfair hardship on good faith purchasers, but would also substantially reduce the value of the estate.  An asset that provides a near-certain guarantee of litigation and no guarantee of

at 122 (citation omitted). "[A]s we and other courts have recognized, [§] 363(m) was created to promote the policy of the finality of bankruptcy court orders, and to prevent harmful effects on the bidding process resulting from the bidders' knowledge that the highest bid may not end up being the final sale price." *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 500 (3d Cir. 1998) (citing *Pittsburgh Food*, 112 F.3d at 647-48).

Section 363(m) applies to sales authorized under § 363(b), which in turn provides that a "trustee ... may ... sell ... other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1). As relevant here, estate property is defined as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Thus a preliminary question is whether the property at issue – in this case, the avoidance claim – is "estate property" as defined by the statute. But there are two problems with addressing that issue here. First is the problem identified by the District Court: the transferability of the avoidance claim is the very merits issue that the Pursuit Parties should have preserved by seeking a stay but did not. It would be procedurally odd, and would undermine the policy rationale behind § 363(m), to allow parties to avoid the responsibility to get a stay by posing a merits issue in the

> ownership is likely to have a low sale price; by removing these risks, § 363(m) allows bidders to offer fair value for estate property.

*In re Rare Earth Minerals*, 445 F.3d 359, 363 (4th Cir. 2006) (internal quotation marks and citations omitted).

20

form of a question about estate property and the applicability of § 363(m).  At least that is how it strikes us in this instance, where the merits issue does not have an obvious answer.  If the requirement of a stay is to have teeth, any reasonably close question about the applicability of § 363(m) should be answered in favor of applicability.  *Cf. In re Brown*, 851 F.3d 619, 622 (6th Cir. 2017) ("This mootness rule applies regardless of the merits of legal arguments raised against the bankruptcy court's order and functions to encourage participation in bankruptcy asset sales and increase the value of the property of the estate by protecting good faith purchasers from modification by an appeals court of the bargain struck with the [trustee]." (alteration in original) (internal quotation marks and citations omitted)), *petition for cert. filed*.

The second problem with addressing the "estate property" question now is that the applicability of § 363(m) was not directly addressed by the parties in their briefing.[16] *See United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("[A]n appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal."). Thus we will assume for the sake of analysis that § 363(m) does apply.

---

[16] The Pursuit Parties made a two paragraph pitch for why the avoidance claim is not estate property in an attempt to demonstrate that the Trustee lacked authority to transfer the claim.  (*See* Opening Br. at 27.)  The Pursuit Parties did not, however, argue that the avoidance claim is exempt from § 363(m) because it did not fall within the meaning of "estate property" under that mootness statute.

Under our case law, § 363(m) moots a challenge to a sale if two conditions are satisfied: "(1) the underlying sale or lease was not stayed pending the appeal, and (2) the court, if reversing or modifying the authorization to sell or lease, would be affecting the validity of such a sale or lease."[17] *Krebs*, 141 F.3d at 499. Though framed as a two-part test, there is actually an additional step because we are first required to ask whether the purchaser at the sale "purchased ... [the] property in good faith." § 363(m); *see also Abbotts Dairies*, 788 F.2d at 147.

## B.     Good Faith

The Pursuit Parties argue that "the sale was not conducted in good faith and suffered value-defeating irregularities[.]" (Opening Br. at 51.) Besides denying that the Creditor Group is a good-faith purchaser, they also argue that the Trustee "expressly discriminated against [them] during the auction, to the detriment of the Debtor's estate[,]" and they claim that the Bankruptcy Court sanctioned that discrimination by approving the sale. (*Id.*) The Bankruptcy Court found that the parties acted in good faith because there was neither evidence of collusion nor anything to suggest that the bidding took place at less than arm's length. It also found that the Creditor Group followed the bidding procedures. The

---

[17] Our test under § 363(m) is a minority position. The majority of our sister circuits have adopted a "per se" rule that moots a challenge to a sale under § 363(m) automatically when a stay is not obtained. *In re Brown*, 851 F.3d at 622 (quotations omitted).

22

District Court affirmed. An analysis of a purchaser's good faith status requires a mixed standard of review: "we exercise plenary review of the legal standard applied by the district and bankruptcy courts, but review the latter court's findings of fact on a clearly erroneous standard[.]" *Abbotts Dairies*, 788 F.2d at 147.

As already noted, for a purchaser to claim the protection of § 363(m), she must have acted in good faith. *In re ICL Holding Co.*, 802 F.3d at 553 (internal quotations marks omitted); *see also In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996) ("[W]here the good faith of the purchaser is at issue, the district court is required to review the bankruptcy court's finding of good faith before dismissing any subsequent appeal as moot under [§] 363(m)."). "Unfortunately, neither the Bankruptcy Code nor the Bankruptcy Rules attempts to define 'good faith.'" *Abbotts Dairies*, 788 F.2d at 147. Courts have thus "turned to traditional equitable principles, holding that the phrase encompasses one who purchases in 'good faith' and for 'value.'" *Id.* (citations omitted). The good faith requirement:

> speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*Id.* (internal quotation marks and citations omitted); *see also In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) ("[T]he good-faith requirement prohibits fraudulent, collusive actions

specifically intended to affect the sale price or control the outcome of the sale.").

As to value, we have said that, "[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt." *Abbotts Dairies*, 788 F.2d at 149. In fact, we have said that "a public auction, as opposed to appraisals and other evidence, is the best possible determinant of the value of ... assets[.]" *Id.* (internal quotation marks omitted). But, on the facts of that case, we rejected a finding of good faith because there was a possibility that the debtor colluded with one of the bidders during the bankruptcy process. *See id.* (reasoning that "no 'auction' took place in the bankruptcy court [if it was predicated on collusion and] … the 'bidding' could not, by definition, serve as the final arbiter of the 'value' of [the debtor's] assets").

Applying those principles here, we see no clear error in the Bankruptcy Court's good faith finding nor any error in the legal standard applied. The Pursuit Parties struggle to point to specific facts that support their contentions to the contrary. They vaguely argue that the Trustee "discriminated against [them] during the auction ... [a]nd ... the Bankruptcy Court sanctioned this discrimination[.]" (Opening Br. at 51.) They also say that the Bankruptcy Court's finding that the "parties acted in good faith" does not answer "whether the auction was conducted in good faith[,]" and that the Trustee failed to provide evidence to support either conclusion. (*Id.*) Lastly, they argue that the Trustee's conduct relating to the modification of the auction procedures, and how those procedures were applied to the Pursuit Parties, constituted bad

24

faith. All of those arguments are conclusory and unpersuasive.

### 1. The Good Faith Conduct of the Trustee and the Creditor Group

The record makes clear that the Trustee acted in accordance with his fiduciary obligations, rather than in collusion with the Creditor Group or through attempts to take unfair advantage of the Pursuit Parties. The Trustee initiated the sale proceedings because he believed that "the sale of the assets [would be] a prudent exercise of his business judgment under the circumstances," since there were no estate funds available to pursue claims in litigation. (JA at 181, 185.) He then stated in his initial motion for sale approval that he was willing to entertain "additional proposals for the assets on similar terms" as an "additional test of ... fairness." (JA at 188.) He followed through by entertaining a bid from the Pursuit Parties and then requesting an auction.

The auction also appears to have been competitive. Indeed, the Trustee stated both at the beginning of the auction and at its adjournment that he favored the Pursuit Parties' bids above any others. That ultimately forced the Creditor Group to increase the value of its bids. After proposing eight substitute dates to reconvene the auction, all to no avail, the Trustee requested final sealed bids instead of postponing the process further. Not only did the Pursuit Parties fail to submit a bid, they withdrew their previous bids. And, following the sealed bidding, the Trustee continued to negotiate privately and publicly with both the Creditor Group and the Pursuit Parties. He ultimately decided to move forward with the sale to the Creditor Group, after extensive review and consultation

25

with the Bankruptcy Court about the best way to proceed. The Pursuit Parties failed to win at the auction not because of the Trustee's conduct, but because of their own decisions during the bidding process. None of that shows a lack of good faith or collusion on the part of the Trustee and the Creditor Group.

Although the Pursuit Parties' brief focuses largely on the conduct of the Trustee, we also note that the evidence indicates the Creditor Group acted in good faith. They complied with the rules of the auction, submitted timely bids, and increased their bids when competition required it. That is exactly how an auction is supposed to work.

## 2. Value

We also conclude that appropriate value was delivered for the claims. As discussed, a competitive auction strongly indicates that a purchaser has paid appropriate value for estate assets. *Abbotts Dairies*, 788 F.2d at 149. Unlike the circumstances in *Abbotts Dairies*, where no real auction took place because there had been collusion, there was competitive bidding here and no evidence of collusion. Thus there is a sound basis for concluding that the auction satisfied the value element of the test for good faith.

The winning final bid in this case was $180,001. That was, notably, $10,001 more than the Pursuit Parties' bid at the end of the live auction, before the auction was forced to adjourn by their scheduling conflict. In addition to the cash aspect of the Creditor Group's bid, the Bankruptcy Court observed that the winning bid offers the opportunity for a recovery to the estate, if litigation of the claims against the

Pursuit Parties is successful. There was no such potential recovery embedded in the Pursuit Parties' bidding because they seek to acquire the claims precisely so that the claims will not be litigated. The Bankruptcy Court acknowledged that fact when it rejected the Pursuit Parties' argument that the Trustee erroneously accepted a bid that was not the highest. The Bankruptcy Court also decided that "the integrity of the auction process, by far, trumps any potential higher bid" because the Pursuit Parties, as experienced bidders, "chose not to provide a sealed bid[] ... and withdrew previous offers made at the auction. (JA at 427-28.) We agree with that reasoning and conclude that the Creditor Group purchased the claims for fair value.

### 3. The Modification of the Auction Procedures

The Pursuit Parties also argue that the "auction was contrary to the [court-ordered] procedures" and thus was conducted in bad faith. (Opening Br. at 52.) Specifically, they say that the Trustee failed to show that adjourning the auction and then requesting final sealed bids enabled him to "comply with his fiduciary obligation[,]" as required by the original bidding procedures. (Opening Br. at 37.) And they argue, even if the modification were proper, that the procedures were applied against them discriminatorily because the Trustee refused to negotiate with them after the final sealed bidding deadline.

This all sounds a bit like the old story of the boy who shot his parents and then asked for special treatment because he was an orphan. The changed auction procedures in this case were, in significant measure, a function of the Pursuit

27

Parties' contentious and at times obstreperous behavior. It is clear that the Trustee had the authority to move to a sealed-bid procedure and did so precisely so that he could comply with his fiduciary duties. A trustee has the duty to "close [the] estate as expeditiously as is compatible with the best interests of parties in interest[.]" 11 U.S.C. § 704(a)(1). The Trustee transitioned to the final sealed bidding process because, despite numerous attempts, he could not coordinate a date to conclude the auction under the original procedures. The new procedure did not discriminate against the Pursuit Parties. They had ample opportunity to participate, and elected not to. The Trustee also entertained multiple bids from the Pursuit Parties and engaged in negotiations with them. Therefore, the record does not substantiate any claim of discrimination or bad faith regarding the auction procedures. The Bankruptcy Court's good-faith finding is sound.

## C. The Stay and Validity Prongs

Because we conclude that the sale was affected in good faith, we can proceed to the application of the two-prong § 363(m) mootness test called for by our decision in *Krebs*, 141 F.3d at 499. That test, again, calls for a finding of mootness if: "(1) the underlying sale or lease [that is being challenged] was not stayed pending the appeal, *and* (2) the court, if reversing or modifying the authorization to sell or lease, would be affecting the validity of such a sale or lease." *Id*. (emphasis added). A challenger can avoid mootness simply by obtaining a stay of the sale order. When a stay is not obtained, mootness may still be avoided in the rare case when a reversal or modification of the sale order will not affect the validity of the sale.

28

## 1.    The Stay Requirement

The first step to a holding of § 363(m) mootness under the *Krebs* test is that the challenger failed to obtain a stay of the sale order.  *Id.*  It is undisputed that the Pursuit Parties failed in exactly that way.  But, referring to the statement in the Sale Order that the claims were being sold "as is[,] where is[,]" they argue that "no stay pending Appeal was necessary ... because [their legal defenses] were expressly preserved in the Sale Order."  (Reply Br. at 3.)  Thus they say that they "did not need to incur the expense associated with seeking a stay[.]"  (*Id.* at 21.)  They provide no legal authority to support that extraordinary assertion of an exemption from § 363(m).[18]  The statutory language is clear and calls for a would-be challenger to seek a stay.  11 U.S.C. § 363(m).  Our decision in *Krebs* identifies a safety valve in § 363(m) so that, as discussed more fully later, a challenger can argue that the sale order in question, though not stayed, nevertheless can be appealed because the relief the challenger seeks will not undermine the sale.  That very narrow exception is quite different than the Pursuit Parties' claim that they preserved their rights in a different way, without seeking a stay.  Our responsibility is to apply the statute, not to accommodate the

---

[18] Following oral argument, the Pursuit Parties submitted a 28(j) letter describing a Tenth Circuit opinion that they say is persuasive and proves that one need not obtain a stay to avoid mootness if one's defenses are otherwise preserved.  Appellant's 28(j) letter, June 19, 2017 (discussing *Paige v. Jubber (In re Paige)*, 685 F.3d 1160 (10th Cir 2012)).  That case is inapposite for the reasons discussed *infra* at n.20.

Pursuit Parties in their failure to comply with it. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." (internal quotation marks omitted)). They did not obtain a stay of the Sale Order, and therefore cannot defeat mootness on that basis.

## 2.     Affecting the Validity of the Sale

The only question left is whether the Pursuit Parties can qualify for the safety valve provided in *Krebs* by showing that a reversal or modification of the sale does not affect the validity of the sale. As just noted, when a sale has not been stayed, a challenge to that sale will be statutorily moot unless a reversal or modification of the sale would not affect the validity of the sale. For obvious reasons, that is a high bar. A challenge to a "central element" of a sale inevitably challenges the validity of the sale. *See Pittsburgh Food*, 112 F.3d at 649 ("One cannot challenge the validity of a central element of a purchase, the sale price, without challenging the validity of the sale itself." (quoting *In re The Charter Co.*, 829 F.2d 1054, 1056 (11th Cir. 1987))). While challenges to specific terms do not always result in § 363(m) mootness, "those challenges that would claw back the sale from a good-faith purchaser" will end in a finding of mootness. *In re ICL Holding Co.*, 802 F.3d at 554.

The "validity of the sale" inquiry gives effect to § 363(m)'s "clear preference in favor of upholding the validity of bankruptcy sales without unduly restricting the appellant's right to contest errors of law made by the

30

bankruptcy court." *In re Brown*, 851 F.3d 619, 623 (6th Cir. 2017). It preserves appellate rights only in those rare circumstances where collateral issues not implicating a central or integral element of a sale are challenged. *Cf.* George W. Kuney, *Slipping Into Mootness*, Norton Ann. Surv. of Bankr. L. Part I, § 3 (West 2007) (recognizing that it is an unusual challenge to a sale that does not distort the validity of the sale and that the exception likely has meaning only when "collateral" issues are challenged). In short, the validity prong of our test provides "[a] narrow exception [that] may lie for challenges to the Sale Order that are so divorced from the overall transaction that the challenged provision would have affected none of the considerations on which the purchaser relied." *In re Westpoint Stevens, Inc.*, 600 F.3d 231, 249 (2d Cir. 2010) (citing *Krebs*, 141 F.3d at 499). In our assessment of whether a challenge affects the validity of a sale, we "must look to the remedies requested by the appellants." *Krebs*, 141 F.3d at 499 (citation omitted).

Some examples are instructive. In *Krebs*, we held that an appeal was statutorily moot when the car dealership for which the case is named tried to purchase a debtor's Jeep franchise in a chapter 11 bankruptcy. *Id.* at 492. That agreement was eventually rejected by the bankruptcy court and the franchise was sold through an auction. *Id.* at 493. Krebs did not obtain a stay. *Id.* at 497. Though it was the ultimate purchaser at the auction, Krebs appealed the decision to reject the original agreement. The district court affirmed. *Id.* at 493. We then concluded that the appeal was moot under § 363(m). We stated that the remedy sought, a ruling that rejection of the original agreement was improper, would "[n]aturally ... have an impact on the validity of the auction sale ... because reversing the rejection would necessarily

31

require reversing the subsequent assumption and assignment of the underlying franchises. Clearly, this remedy is not permitted by section 363(m)." *Id.* at 499. Krebs had not obtained a stay, the case was moot, and we dismissed it. *Id.*

A case from the United States Court of Appeals for the Eighth Circuit also decided that a challenge to a sale was moot because it implicated an integral part of the sale. In *In re Trism Inc.*, the bankruptcy court approved an order that authorized the sale of Trism's assets to Bed Rock, Inc. 328 F.3d 1003, 1005 (8th Cir. 2003). The sale order released "Bed Rock, Bed Rock's principal owner and president ... and CIT Group/Business Credit, Inc. ... from all avoidance liability." *Id.* A group of unsecured creditors appealed that order and release of liability, and the Bankruptcy Appellate Panel dismissed the appeal as moot under § 363(m). *Id.* The Eighth Circuit agreed that the appeal was moot, concluding that the release of liability was "integral to the sale of Trism's assets to Bed Rock." *Id.* at 1007. That was because "the ... Agreement conditioned the closing of the sale upon the bankruptcy court entering an order providing that [Bed Rock's president] would have no liability to Trism's estate or the [unsecured creditors] ... [and] CIT's release ... is directly linked to absolving [the president] from liability." *Id.* (internal quotation marks omitted). Thus, the court ruled that reversal would affect the validity of the sale and the appeal was moot.

We reached a different outcome in *In re ICL*, 802 F.3d at 553-54. There, the United States government, asserting a tax interest in sale proceeds, challenged the sale of a debtor's assets. The purchasers agreed to fund winding-down costs of the company, and the money for that purpose was placed in

escrow until winding-down was completed. *Id.* at 550-52. The government also challenged an agreement between lenders to place in trust certain monies for the benefit of unsecured lenders. *Id.* The government received nothing under those proposals. *Id.* The bankruptcy court rejected the government's arguments, approved both agreements, and denied a request for a stay of the sale. *Id.* at 552. On appeal, we addressed "whether we c[ould] give the [g]overnment the relief it s[ought] – 'a redistribution' of the escrowed funds" and trust monies – "without disturbing the sale." *Id.* at 554. The lenders argued that the relief could not be granted without affecting the validity of the sale because such reallocation "w[ould] change a fundamental term of the transaction" and deprive them of key, bargained-for terms. *Id.* (internal quotations and citations omitted). We rejected those arguments, stating that § 363(m) "stamps out only those challenges that would claw back the sale from a good-faith purchaser." *Id.* On those facts, the specific remedy the government wanted would not undermine the validity of the sale, so we decided that the appeal was not moot under § 363(m). *Id.*

With that background, we assess whether the remedy sought in this case can be granted without impacting the sale's validity. If it cannot, then the appeal is moot. The Pursuit Parties describe the remedy they want as "a finding that the Trustee lacked authority to sell avoidance powers[.]" (Opening Br. at 53.) Alternatively – though it amounts to the same thing here – they argue for a ruling that avoidance powers "d[o] not belong to the estate and may not as a matter of law or policy [be] transfer[red] to the Creditors." (Opening Br. at 55 (citation omitted).) The Pursuit Parties assert that

we can make those legal rulings without affecting the validity of the sale.

Both of those arguments share a common denominator: they differentiate between the ability to pursue a claim and the ownership of the claim. The Pursuit Parties say that the Creditor Group will continue to own the claim they bought, regardless of whether we rule that the Creditor Group lacks the power to prosecute it or that the claim is not an avoidance claim at all. And, as the Pursuit Parties see it, ownership of the claim, even without the ability to pursue it as an avoidance claim, does not affect the sale's validity because, again, there was an agreed-to "as is, where is" disclaimer included in the final sale agreement. In colloquial terms, the Creditor Group purchased a "pig in a poke" and assumed the risk that the "poke" would not contain what had been hoped.

But, at least as to this appeal of the Sale Order, that reasoning cannot withstand scrutiny. If we agreed with the Pursuit Parties and ruled now that the avoidance powers did not transfer with the claims themselves,[19] our ruling would surely affect the validity of the sale in the sense that the

---

[19] In assessing this aspect of statutory mootness, we emphasize that we are not deciding whether the sale transferred a valid avoidance claim. Whether avoidance powers can be transferred is a question before the Bankruptcy Court now and one we may confront on another day. At this juncture, we are assuming without deciding that those powers can be and were transferred in this case, and we do so solely for the disposition of this particular appeal.

34

ability to pursue a claim is essential to any meaningful transfer of such an asset. As the Trustee explained:

> [t]he Creditor Group's ability to pursue the Claims was a central element of the sale of these Claims. It would have made no sense for the Trustee or the Creditor Group to enter into the Sale Agreement if any of them believed that the Creditor Group was legally barred from … bringing the Claims.

(Answering Br. at 21.)

We agree. To hold otherwise would allow a "claw back" of the sale itself because the value of the claims, without the ability to prosecute them, would be completely eliminated and a central feature of the transaction would thus be frustrated, through no apparent fault of the Creditor Group. *See, e.g.*, *Pieper, Inc. v. Land O'Lakes Farmland Feed, LLC*, 390 F.3d 1062, 1066 (8th Cir. 2004) (concluding that defendant's expressed principal purpose for entering an agreement was substantially frustrated by the failure of basic assumption of the agreement, defeating the commercial reason for contract); *Unihealth v. U.S. Healthcare, Inc.*, 14 F. Supp. 2d 623, 635 (D.N.J. 1998) (recognizing frustration of purpose where an unexpected regulatory change "substantially frustrate[d] the principal purpose of the Agreement to the unfair advantage of one party"); 30 Williston on Contracts § 77:95 (4th ed. 2017) (explaining that the "purpose of the commercial frustration doctrine is to do equity," and that it excuses performance "when the parties' overall contractual intent and objectives have been completely thwarted"). We agree with the District Court that

35

"a finding that the Trustee lacked authority to transfer the causes of action ... 'would affect its validity' and demonstrate that the sale was flawed." (JA at 55 (citation omitted).) We therefore reject the Pursuit Parties' arguments and hold that we cannot give them the remedy they seek without affecting the validity of the sale. Because we cannot do that, this appeal is statutorily moot.[20]

---

[20] The Pursuit Parties submitted a 28(j) letter relying on *In re Paige*, 685 F.3d 1160 (10th Cir. 2012). In that case, a defendant in an adversary proceeding appealed from a bankruptcy court's judgment. The bankruptcy court had ruled that a domain name registered to the defendant belonged to a bankruptcy debtor's estate and was thus subject to a sale agreement between a bankruptcy trustee and a purchaser of the domain name. *Id.* at 1164-66, 1169-70. Notably, the defendant *did not* appeal the sale approval order itself. *Id.* at 1170. The sale agreement contained a provision that delayed a final closing on the domain name until a final and nonappealable order was issued. *Id.* at 1174. But the purchaser waived that provision following the bankruptcy court's judgment and took ownership of the domain name. *Id.*

The defendant sought to stay that judgment order, and the bankruptcy court denied the request. *Id.* The district court affirmed, but in the alternative ruled that the appeal was moot under § 363(m). *Id.* at 1175. On appeal, the Tenth Circuit agreed with the defendant that the appeal was not moot because the purchaser "took the Domain Name Assets subject to [the defendant's] defenses, 'pending a ruling on such defenses in the Pending Adversary [proceeding].'" *Id.* at 1190 (citation omitted). In essence, because the purchaser took title before a final and nonappealable order had issued, it

## III. Conclusion

For the foregoing conclusions, we will dismiss the Pursuit Parties' appeal of the Sale Order as statutorily moot under 11 U.S.C. § 363(m).

---

"accepted the risk that [the defendant] could still prevail on the defenses it retained under the Sale Order." *Id.* at 1191. So, § 363(m) did not strip the defendant of those defenses. *Id.*

The Pursuit Parties argue that, despite not being binding, *In re Paige* is persuasive because the facts are parallel to this case. At this point, however, the case is simply inapposite. Unlike this case, the defendant in *In re Paige* had already defended the adversary proceeding on the merits, a judgment was issued against it, and then it challenged the bankruptcy court's rulings. Nothing we say here is meant to limit the Bankruptcy Court from addressing issues that are rightly before it in the first instance.